instrument relating to any such Indebtedness, or any other event, shall occur and shall continue after the applicable grace period, if any, specified in such agreement or instrument, if the effect of such default or event is to accelerate, or to permit the acceleration of, the maturity of such Indebtedness; or any such Indebtedness shall be declared to be due and payable, or required to be prepaid (other than by a regularly scheduled required prepayment), redeemed, purchased or defeased or an offer to prepay, redeem, purchase or defease such Indebtedness shall be required to be made, in each case, prior to the stated maturity thereof;

        (f)     the Borrower or any of its Subsidiaries (i) shall institute any proceeding or voluntary case seeking to adjudicate it bankrupt or insolvent, or seeking dissolution, liquidation, winding up, reorganization, arrangement, adjustment, protection, relief or composition of it or its debts under any law relating to bankruptcy, insolvency, reorganization or relief of debtors, or seeking the entry of an order for relief or the appointment of a receiver, trustee, custodian or other similar official for any such Person or for any substantial part of its property, (ii) shall be generally not paying its debts as such debts become due or shall admit in writing its inability to pay its debts generally, (iii) shall make a general assignment for the benefit of creditors, or (iv) shall take any action to authorize or effect any of the actions set forth above in this subsection (f);

        (g)     any proceeding shall be instituted against the Borrower or any of its Subsidiaries seeking to adjudicate it bankrupt or insolvent, or seeking dissolution, liquidation, winding up, reorganization, arrangement, adjustment, protection, relief of debtors, or seeking the entry of an order for relief or the appointment of a receiver, trustee, custodian or other similar official for any such Person or for any substantial part of its property, and either such proceeding shall remain undismissed or unstayed for a period of 30 days or any of the actions sought in such proceeding (including, without limitation, the entry of an order for relief against any such Person or the appointment of a receiver, trustee, custodian or other similar official for it or for any substantial part of its property) shall occur;

        (h)     one or more judgments, orders or awards (or any settlement of any claim that, if breached, could result in a judgment, order or award) for the payment of money exceeding $250,000 in the aggregate shall be rendered against the Borrower or any of its Subsidiaries, unless stayed or bonded pending appeal;

        (i)     except as expressly permitted pursuant to Section 6.02(c), unless the Required Lenders consent in writing, the Borrower or any of its Subsidiaries dissolves, or suspends or discontinues an existing business;

        (j)     the Borrower or any of its Subsidiaries is prohibited or otherwise restrained from conducting the business theretofore conducted by it in any manner that has or could reasonably be expected to result in a Material Adverse Effect by virtue of any determination, ruling, decision, decree or order of any court or Governmental Authority of competent jurisdiction;

        (k)     (i) the indictment of the Borrower or any of its Subsidiaries under any criminal statute, or the commencement of criminal proceedings against the Borrower or any of its Subsidiaries or (ii) an adverse finding in any civil proceeding against

the Borrower or any of its Subsidiaries, pursuant to which statute or proceedings the penalties or remedies sought or available include forfeiture to any Governmental Authority of any material portion of the property of such Person; or

(l)     a Change of Control shall have occurred, except that a transaction where the proceeds of such transaction are used to indefeasibly pay all Obligations in full in cash upon the consummation thereof (and all remaining Term Loan Commitments are terminated contemporaneously therewith) shall not be deemed a Change of Control for purposes of this Section 7.01(l);

then, and in any such event, the Agent may, and shall at the request of the Required Lenders, (i) terminate or reduce all Term Loan A Commitments and/or all Term Loan B Commitments, and upon the request of the Term Loan A-1 Lenders terminate the Term Loan A-1 Commitments whereupon all such Term Loan A Commitments, such Term Loan A-1 Commitments and/or Term Loan B Commitments shall immediately be so terminated or reduced, (ii) declare all or any portion of the Loans then outstanding to be due and payable, whereupon all or such portion of the aggregate principal of all Loans, all accrued and unpaid interest thereon, all fees and all other amounts payable under this Agreement and the other Loan Documents shall become due and payable immediately, without presentment, demand, protest or further notice of any kind, all of which are hereby expressly waived by each Loan Party and (iii) exercise any and all of its other rights and remedies under applicable law, hereunder and under the other Loan Documents; provided, however, that upon the occurrence of any Event of Default described in subsection (f) or (g) of this Section 7.01 with respect to any Loan Party, without any notice to any Loan Party or any other Person or any act by the Agent or any Lender, all Term Loan A Commitments, Term Loan A-1 Commitments and Term Loan B Commitments shall automatically terminate and all Loans then outstanding, together with all accrued and unpaid interest thereon, all fees and all other amounts due under this Agreement and the other Loan Documents shall become due and payable automatically and immediately, without presentment, demand, protest or notice of any kind, all of which are expressly waived by each Loan Party.

Section 7.02    Agent Matters Upon Default.  The Agent shall not be deemed to have knowledge or notice of the occurrence of any Default or Event of Default (other than the payment of any principal of or interest on any Loan and any accrued and unpaid fees and expenses of the Agent) unless the Agent has received written notice from a Lender or the Borrower referring to this Agreement, describing such Default or Event of Default and stating that such notice is a "notice of default" or "notice of event of default".  In the event that the Agent receives such a written notice, the Agent shall give notice thereof to all the Lenders and the Borrower.  The Agent shall take such action with respect to such Default or Event of Default as shall be reasonably directed by the Required Lenders (or, if so specified by this Agreement, all Lenders); provided that unless and until the Agent shall have received such directions, the Agent may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to such Default or Event of Default as it shall deem advisable in the best interests of the Lenders.

## ARTICLE VIII

## AGENT

Section 8.01    <u>Appointment</u>.  Each Lender (and each subsequent maker of any Loan by its making thereof) hereby irrevocably appoints and authorizes the Agent to perform the duties of the Agent as set forth in this Agreement and the other Loan Documents including:  (i) to receive on behalf of each Lender any payment of principal of or interest on the Loans outstanding hereunder and all other amounts accrued hereunder for the account of the Lenders and paid to the Agent, and, subject to Section 2.02 of this Agreement, to distribute promptly to each Lender its Pro Rata Share of all payments so received; (ii) to distribute to each Lender copies of all material notices and agreements received by the Agent and not required to be delivered by any Loan Party to each Lender pursuant to the terms of this Agreement, provided that the Agent shall not have any liability to the Lenders for the Agent's inadvertent failure to distribute any such notices or agreements to the Lenders; (iii) to maintain, in accordance with its customary business practices, ledgers and records reflecting the status of the Obligations, the Loans, and related matters and to maintain, in accordance with its customary business practices, ledgers and records reflecting the status of the Collateral and related matters; (iv) after the Effective Date, to arrange for the filing and continuation, of financing statements or other filing or recording documents or instruments (collectively, the "<u>Financing Statements</u>") for the perfection of security interests in the Collateral; <u>provided</u>, that, the Agent shall not be responsible for the preparation, form, content, sufficiency or adequacy of any such Financing Statements all of which shall be provided in writing to the Agent by the Required Lenders including the jurisdictions and filing offices where the Agent is required to file such Financing Statements; (v) to perform, exercise, and enforce any and all other rights and remedies of the Lenders with respect to the Loan Parties, the Obligations, or otherwise related to any of same to the extent reasonably incidental to the exercise by the Agent of the rights and remedies specifically authorized to be exercised by the Agent by the terms of this Agreement or any other Loan Document; (vi)  subject to Section 8.03 of this Agreement, to incur and pay such fees necessary or appropriate for the performance and fulfillment of its functions and powers pursuant to this Agreement or any other Loan Document; and (vii) subject to Section 8.03 of this Agreement, to take such action as the Agent deems appropriate on its behalf to administer the Loans and the Loan Documents and to exercise such other powers delegated to the Agent by the terms hereof or the other Loan Documents (including, without limitation, the power to give or to refuse to give notices, waivers, consents, approvals and instructions and the power to make or to refuse to make determinations and calculations) together with such powers as are reasonably incidental thereto to carry out the purposes hereof and thereof.  As to any matters not expressly provided for by this Agreement and the other Loan Documents (including, without limitation, enforcement or collection of the Loans), the Agent shall not be required to exercise any discretion or take any action, but shall be required to act or to refrain from acting (and shall be fully protected in so acting or refraining from acting) upon the instructions of the Required Lenders, and such instructions of the Required Lenders shall be binding upon all Lenders and all makers of Loans; <u>provided</u>, <u>however</u>, that the Agent shall not be required to take any action which, in the reasonable opinion of the Agent, exposes the Agent to liability or which is contrary to this Agreement or any other Loan Document or applicable law.

Section 8.02   <u>Nature of Duties</u>.  The Agent shall have no duties or responsibilities except those expressly set forth in this Agreement or in the other Loan Documents.  The duties of the Agent shall be mechanical and administrative in nature.  The Agent shall not have by reason of this Agreement or any other Loan Document a fiduciary relationship in respect of any Lender.  Nothing in this Agreement or any other Loan Document, express or implied, is intended to or shall be construed to impose upon the Agent any obligations in respect of this Agreement or any other Loan Document except as expressly set forth herein or therein.  Each Lender shall make its own independent investigation of the financial condition and affairs of the Loan Parties in connection with the making and the continuance of the Loans hereunder and shall make its own appraisal of the creditworthiness of the Loan Parties and the value of the Collateral, and the Agent shall have no duty or responsibility, either initially or on a continuing basis, to provide any Lender with any credit or other information with respect thereto, whether coming into their possession before the initial Loan hereunder or at any time or times thereafter, provided that, upon the reasonable written request of a Lender, the Agent shall provide to such Lender any documents or reports delivered to the Agent by the Loan Parties pursuant to the terms of this Agreement or any other Loan Document.  If the Agent seeks the consent or approval of the Required Lenders to the taking or refraining from taking any action hereunder, the Agent shall send notice thereof to each Lender.  The Agent shall promptly notify each Lender any time that the Required Lenders have instructed the Agent to act or refrain from acting pursuant hereto.  Without limiting the foregoing, it is understood that upon receipt by the Agent of any request, action or information for which the vote, or determination or direction of the Lenders is required in accordance with the terms hereof, the Agent agrees to promptly make such request, or provide such information, to the Lenders.  The Agent may execute any of its duties under this Agreement and the other Loan Documents by or through agents or attorneys-in-fact and shall be entitled to rely on advice of counsel concerning all matters pertaining to such duties.  The Agent shall not be responsible for the negligence or misconduct of any agents or attorneys-in-fact selected by it with reasonable care.

Section 8.03   <u>Rights, Exculpation, Etc</u>.  The Agent and its directors, officers, agents or employees shall not be liable for any action taken or omitted to be taken by them under or in connection with this Agreement or the other Loan Documents, except for their own gross negligence or willful misconduct as determined by a final non-appealable judgment of a court of competent jurisdiction.  Without limiting the generality of the foregoing, the Agent (i) may treat the payee of any Loan as the owner thereof until the Agent receives an Assignment and Acceptance, pursuant to Section 10.07 hereof, signed by such payee; (ii) may consult with legal counsel (including, without limitation, counsel to the Agent or counsel to the Loan Parties), independent public accountants, and other experts selected by any of them and shall not be liable for any action taken or omitted to be taken in good faith by any of them in accordance with the advice of such counsel or experts; (iii) makes no warranty or representation to any Lender and shall not be responsible to any Lender for any statements, certificates, warranties or representations made in or in connection with this Agreement or the other Loan Documents; (iv) shall not have any duty to ascertain or to inquire as to the performance or observance of any of the terms, covenants or conditions of this Agreement or the other Loan Documents on the part of any Person, the existence or possible existence of any Default or Event of Default, or to inspect the Collateral or other property (including, without limitation, the books and records) of any Person; (v) shall not be responsible to any Lender for the due execution, legality, validity, enforceability, genuineness, sufficiency or value of this Agreement or the other Loan Documents

or any other instrument or document furnished pursuant hereto or thereto; and (vi) shall not be deemed to have made any representation or warranty regarding the existence, value or collectibility of the Collateral, the existence, priority or perfection of the Agent's Lien thereon, or any certificate prepared by any Loan Party in connection therewith, nor shall the Agent be responsible or liable to the Lenders for any failure to monitor or maintain any portion of the Collateral. The Agent shall not be liable for any apportionment or distribution of payments made in good faith pursuant to Section 3.03, and if any such apportionment or distribution is subsequently determined to have been made in error the sole recourse of any Lender to whom payment was due but not made, shall be to recover from other Lenders any payment in excess of the amount which they are determined to be entitled. The Agent may at any time request instructions from the Lenders with respect to any actions or approvals which by the terms of this Agreement or of any of the other Loan Documents the Agent is permitted or required to take or to grant, and if such instructions are promptly requested, the Agent shall be absolutely entitled to refrain from taking any action or to withhold any approval under any of the Loan Documents until they shall have received such instructions from the Required Lenders. Without limiting the foregoing, no Lender shall have any right of action whatsoever against the Agent as a result of the Agent acting or refraining from acting under this Agreement or any of the other Loan Documents in accordance with the instructions of the Required Lenders.

Section 8.04    Reliance. The Agent shall be entitled to rely upon any written notices, statements, certificates, orders or other documents or any telephone message believed by it in good faith to be genuine and correct and to have been signed, sent or made by the proper Person, and with respect to all matters pertaining to this Agreement or any of the other Loan Documents and its duties hereunder or thereunder, upon advice of counsel selected by it.

Section 8.05    Indemnification. To the extent that the Agent is not reimbursed and indemnified by any Loan Party, the Lenders will, within five (5) Business Days of written demand by the Agent, reimburse and indemnify the Agent from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses (including, without limitation, client charges and expenses of counsel or any other advisor to the Agent), advances or disbursements of any kind or nature whatsoever which may be imposed on, incurred by, or asserted against the Agent in any way relating to or arising out of this Agreement or any of the other Loan Documents or any action taken or omitted by the Agent under this Agreement or any of the other Loan Documents, in proportion to each Lender's Pro Rata Share; provided, however, that no Lender shall be liable for any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses, advances or disbursements for which there has been a final non-appealable judicial determination by a court of competent jurisdiction that such liability resulted from the Agent's gross negligence or willful misconduct. The obligations of the Lenders under this Section 8.05 shall survive the payment in full of the Loans, the termination of this Agreement and the earlier resignation or removal of the Agent.

Section 8.06    Agent Individually. With respect to its Pro Rata Share of the Total Commitment hereunder and the Loans made by it, if any, the Agent shall have and may exercise the same rights and powers hereunder and is subject to the same obligations and liabilities as and to the extent set forth herein for any other Lender or maker of a Loan. The terms "Lenders" or "Required Lenders" or any similar terms shall, unless the context clearly otherwise indicates, include the Agent in its individual capacity as a Lender or one of the Required Lenders. The

Agent and its Affiliates may accept deposits from, lend money to, and generally engage in any kind of banking, trust or other business with the Borrower as if it were not acting as an Agent pursuant hereto without any duty to account to the other Lenders.

Section 8.07    Successor Agent. (a)  The Agent may resign from the performance of all its functions and duties hereunder and under the other Loan Documents at any time by giving at least thirty (30) Business Days' prior written notice to the Borrower and each Lender. Such resignation shall take effect upon the acceptance by a successor Agent of appointment pursuant to clauses (b) and (c) below or as otherwise provided below.

(b)    Upon any such notice of resignation, the Required Lenders shall appoint a successor Agent.  Upon the acceptance of any appointment as Agent hereunder by a successor Agent, such successor Agent shall thereupon succeed to and become vested with all the rights, powers, privileges and duties of the retiring Agent, and the retiring Agent shall be discharged from its duties and obligations under this Agreement and the other Loan Documents.  After the Agent's resignation hereunder as an Agent, the provisions of this Article VIII shall inure to its benefit as to any actions taken or omitted to be taken by it while it was an Agent under this Agreement and the other Loan Documents.

(c)    If a successor Agent shall not have been so appointed within said thirty (30) Business Day period, the retiring Agent shall then appoint a successor Agent who shall serve as an Agent until such time, if any, as the Required Lenders appoint a successor Agent as provided above.

Section 8.08    Agency for Perfection.  The Agent and each Lender hereby appoints the Agent and each other Lender as agent and bailee for the purpose of perfecting the security interests in and Liens upon the Collateral in assets which, in accordance with Article 9 of the Uniform Commercial Code, can be perfected only by possession or control (or where the security interest of a secured party with possession or control has priority over the security interest of another secured party) and the Agent and each Lender hereby acknowledges that it holds possession of or otherwise controls any such Collateral for the benefit of the Agent and the Lenders as secured party.  Should any Lender obtain possession or control of any such Collateral, such Lender shall notify the Agent thereof, and, promptly upon the Agent's request therefor shall deliver such Collateral to the Agent or in accordance with the Agent's instructions. In addition, the Agent shall also have the power and authority hereunder to appoint such other sub-agents as may be necessary or required under applicable state law or otherwise to perform its duties and enforce its rights with respect to the Collateral and under the Loan Documents and the Agent shall not be responsible for the negligence or misconduct of any sub-agents selected by it with reasonable care.  Each Loan Party, by its execution and delivery of this Agreement, hereby consents to the foregoing.

Section 8.09    No Reliance on the Agent's Customer Identification Program. Each Lender acknowledges and agrees that neither such Lender, nor any of its Affiliates, participants or assignees, may rely on the Agent to carry out such Lender's, Affiliate's, participant's or assignee's customer identification program, or other requirements imposed by the USA PATRIOT Act or the regulations issued thereunder, including the regulations set forth in 31 CFR § 103.121, as hereafter amended or replaced ("CIP Regulations"), or any other Anti-

Terrorism Laws, including any programs involving any of the following items relating to or in connection with any of the Loan Parties, their Affiliates or their agents, the Loan Documents or the transactions hereunder or contemplated hereby: (1) any identity verification procedures, (2) any recordkeeping, (3) comparisons with government lists, (4) customer notices or (5) other procedures required under the CIP Regulations or other regulations issued under the USA PATRIOT Act. Each Lender, Affiliate, participant or assignee subject to Section 326 of the USA PATRIOT Act will perform the measures necessary to satisfy its own responsibilities under the CIP Regulations.

      Section 8.10    No Third Party Beneficiaries.  The provisions of this Article are solely for the benefit of the Agent and the Lenders, and no Loan Party shall have rights as a third party beneficiary of any of such provisions.

      Section 8.11    No Fiduciary Relationship.  It is understood and agreed that the use of the term "agent" herein or in any other Loan Document (or any other similar term) with reference to the Agent is not intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine or any applicable law. Instead such term is used as a matter of market custom, and is intended to create or reflect only an administrative relationship between contracting parties. In addition, it is understood and agreed that neither the Agent nor any Lender has any fiduciary or insider relationship with or duty to any Loan Party arising out of or in connection with this Agreement or any of the other Loan Documents, and the relationship between Agent and Lenders, on one hand, and the Loan Parties, on the other hand, in connection herewith or therewith is solely that of debtor and creditor.

      Section 8.12    Reports; Confidentiality; Disclaimers.  By becoming a party to this Agreement, each Lender (subject to Section 10.18):

      (a)      is deemed to have requested that the Agent furnish such Lender, promptly after it becomes available, a copy of each field audit or examination report with respect to the Borrower or any of its Subsidiaries by a third party selected by the Required Lenders (each, a "Report") and the Agent shall so furnish each Lender with each such Report,

      (b)      expressly agrees and acknowledges that the Agent (i) does not make any representation or warranty as to the accuracy of any Reports, and (ii) shall not be liable for any information contained in any Reports,

      (c)      expressly agrees and acknowledges that the Reports are not comprehensive audits or examinations, that the Agent or other party performing any audit or examination will inspect only specific information regarding the Borrower and its Subsidiaries and will rely significantly upon the Borrower's and its Subsidiaries' books and records, as well as on representations of their personnel, and

      (d)      agrees to keep all Reports and other material, non-public information regarding the Borrower and its Subsidiaries and their operations, assets, and existing and contemplated business plans in a confidential manner.

      Section 8.13    Collateral Matters

(a)      Each Lender (i) consents and agrees to the terms of each Security Document, as originally in effect and as amended, supplemented or replaced from time to time in accordance with its terms or the terms of this Financing Agreement, (ii) authorizes and directs the Agent to enter into the Security Documents to which it is a party, (iii) authorizes and empowers the Agent to execute and deliver the Intercreditor Agreement and (iv) authorizes and empowers the Agent to bind the Lenders as set forth in the Security Documents to which the Agent is a party and the Intercreditor Agreement and to perform its obligations and exercise its rights and powers thereunder.

(b)      Upon request by the Agent at any time, the Lenders will promptly confirm in writing the Agent's authority to release particular types or items of Collateral.

## ARTICLE IX

## GUARANTY

Section 9.01   Guaranty.  Each Guarantor hereby jointly and severally and unconditionally and irrevocably guarantees the punctual payment when due and performance, whether at stated maturity, by acceleration or otherwise, of all Obligations of the Borrower now or hereafter existing under any Loan Document, whether for principal, interest (including, without limitation, all interest that accrues after the commencement of any Insolvency Proceeding of the Borrower, whether or not a claim for post-filing interest is allowed in such Insolvency Proceeding), fees, commissions, expense reimbursements, indemnifications or otherwise (such obligations, to the extent not paid by the Borrower, being the "Guaranteed Obligations"), and agrees to pay any and all expenses (including reasonable counsel fees and expenses) payable under Section 10.04 and all expenses incurred by the Agent and the Lenders in enforcing any rights under the guaranty set forth in this ARTICLE IX.  Without limiting the generality of the foregoing, each Guarantor's liability shall extend to all amounts that constitute part of the Guaranteed Obligations and would be owed by the Borrower to the Agent and the Lenders under any Loan Document but for the fact that they are unenforceable or not allowable due to the existence of an Insolvency Proceeding involving the Borrower.  In no event shall the obligation of any Guarantor hereunder exceed the maximum amount such Guarantor could guarantee under any bankruptcy, insolvency or other similar law.  Each of the Guarantors further agrees that the Guaranteed Obligations may be extended, increased or renewed, amended or modified, in whole or in part, without notice to, or further assent from, such Guarantor and that such Guarantor will remain bound upon its guarantee hereunder notwithstanding any such extension, increase, renewal, amendment or modification of any Guaranteed Obligation.

Section 9.02   Guaranty Absolute.  Each Guarantor jointly and severally guarantees that the Guaranteed Obligations will be paid strictly in accordance with the terms of the Loan Documents, regardless of any law, regulation or order now or hereafter in effect in any jurisdiction affecting any of such terms or the rights of the Agent and the Lenders with respect thereto.  Each Guarantor agrees that this ARTICLE IX constitutes a guaranty of payment when due and not of collection and waives any right to require that any resort be made by the Agent or any Lender to any Collateral.  The obligations of each Guarantor under this ARTICLE IX are independent of the Guaranteed Obligations, and a separate action or actions may be brought and prosecuted against each Guarantor to enforce such obligations, irrespective of whether any action

is brought against any Loan Party or whether any Loan Party is joined in any such action or actions. The liability of each Guarantor under this ARTICLE IX shall be irrevocable, absolute and unconditional irrespective of, and each Guarantor hereby irrevocably waives any defenses it may now or hereafter have in any way relating to, any or all of the following:

> (a)    any lack of validity or enforceability of any Loan Document or any agreement or instrument relating thereto;

> (b)    any change in the time, manner or place of payment of, or in any other term of, all or any of the Guaranteed Obligations, or any other amendment or waiver of or any consent to departure from any Loan Document, including, without limitation, any increase in the Guaranteed Obligations resulting from the extension of additional credit to any Loan Party or otherwise;

> (c)    any taking, exchange, release or non-perfection of any Collateral, or any taking, release or amendment or waiver of or consent to departure from any other guaranty, for all or any of the Guaranteed Obligations;

> (d)    the existence of any claim, set-off, defense or other right that any Guarantor may have at any time against any Person, including, without limitation, the Agent or any Lender;

> (e)    any change, restructuring or termination of the corporate, limited liability company or partnership structure or existence of any Loan Party; or

> (f)    any other circumstance (including, without limitation, any statute of limitations) or any existence of or reliance on any representation by the Agent or the Lenders that might otherwise constitute a defense available to, or a discharge of, any Loan Party or any other guarantor or surety.

This ARTICLE IX shall continue to be effective or be reinstated, as the case may be, if at any time any payment of any of the Guaranteed Obligations is rescinded or must otherwise be returned by the Agent, the Lenders, or any other Person upon the insolvency, bankruptcy or reorganization of the Borrower or otherwise, all as though such payment had not been made.

> Section 9.03    Waiver. Each Guarantor hereby waives (i) promptness and diligence, (ii) notice of acceptance and any other notice with respect to any of the Guaranteed Obligations and this ARTICLE IX and any requirement that the Agent or the Lenders exhaust any right or take any action against any Loan Party or any other Person or any Collateral, (iii) any right to compel or direct the Agent or any Lender to seek payment or recovery of any amounts owed under this ARTICLE IX from any one particular fund or source or to exhaust any right or take any action against any other Loan Party, any other Person or any Collateral, (iv) any requirement that the Agent or any Lender protect, secure, perfect or insure any security interest or Lien on any property subject thereto or exhaust any right to take any action against any Loan Party, any other Person or any Collateral, and (v) any other defense available to any Guarantor. Each Guarantor agrees that the Agent and the Lenders shall have no obligation to marshal any assets in favor of any Guarantor or against, or in payment of, any or all of the Obligations. Each Guarantor acknowledges that it will receive direct and indirect benefits from the financing

arrangements contemplated herein and that the waiver set forth in this Section 9.03 is knowingly made in contemplation of such benefits. Each Guarantor hereby waives any right to revoke this ARTICLE IX, and acknowledges that this ARTICLE IX is continuing in nature and applies to all Guaranteed Obligations, whether existing now or in the future.

Section 9.04    Continuing Guaranty; Assignments. This ARTICLE IX is a continuing guaranty and shall (a) remain in full force and effect until the later of the cash payment in full of the Guaranteed Obligations (other than indemnification obligations as to which no claim has been made) and all other amounts payable under this ARTICLE IX and  as to Term Loan A-1, the Final Term Loan A-1 Maturity Date and as to Term Loan A and Term Loan B. the Final Maturity Date, (b) be binding upon each Guarantor, its successors and assigns and (c) inure to the benefit of and be enforceable by the Agent and the Lenders and their successors, pledgees, transferees and assigns. Without limiting the generality of the foregoing clause (c), any Lender may pledge, assign or otherwise transfer all or any portion of its rights and obligations under this Agreement (including, without limitation, all or any portion of its Term Loan A Commitment, its Term Loan A-1 Commitments, its Term Loan B Commitment, its Loans owing to it) to any other Person, and such other Person shall thereupon become vested with all the benefits in respect thereof granted such Lender herein or otherwise, in each case as provided in Section 10.07.

Section 9.05    Subrogation. No Guarantor will exercise any rights that it may now or hereafter acquire against any Loan Party or any other guarantor that arise from the existence, payment, performance or enforcement of such Guarantor's obligations under this ARTICLE IX, including, without limitation, any right of subrogation, reimbursement, exoneration, contribution or indemnification and any right to participate in any claim or remedy of the Agent and the Lenders against any Loan Party or any other guarantor or any Collateral, whether or not such claim, remedy or right arises in equity or under contract, statute or common law, including, without limitation, the right to take or receive from any Loan Party or any other guarantor, directly or indirectly, in cash or other property or by set-off or in any other manner, payment or security solely on account of such claim, remedy or right, unless and until all of the Guaranteed Obligations and all other amounts payable under this ARTICLE IX shall have been paid in full in cash and as to Term Loan A-1, the Final Term Loan A-1 Maturity Date shall have occurred and as to Term Loan A and Term Loan B, the Final Maturity Date shall have occurred. If any amount shall be paid to any Guarantor in violation of the immediately preceding sentence at any time prior to the later of the payment in full in cash of the Guaranteed Obligations and all other amounts payable under this ARTICLE IX and as to Term Loan A-1, the Final Term Loan A-1 Maturity Date and as to Term Loan A and Term Loan B, the Final Maturity Date, such amount shall be held in trust for the benefit of the Agent and the Lenders and shall forthwith be paid to the Agent and the Lenders to be credited and applied to the Guaranteed Obligations and all other amounts payable under this ARTICLE IX, whether matured or unmatured, in accordance with the terms of this Agreement, or to be held as Collateral for any Guaranteed Obligations or other amounts payable under this ARTICLE IX thereafter arising. If (i) any Guarantor shall make payment to the Agent and the Lenders of all or any part of the Guaranteed Obligations, (ii) all of the Guaranteed Obligations and all other amounts payable under this ARTICLE IX shall be paid in full in cash and (iii) as to Term Loan A-1, the Final Term Loan A-1 Maturity Date shall have occurred and as to Term Loan A and Term Loan B, the Final Maturity Date shall have occurred, the Agent and the Lenders will, at such Guarantor's request

and expense, execute and deliver to such Guarantor appropriate documents, without recourse and without representation or warranty, necessary to evidence the transfer by subrogation to such Guarantor of an interest in the Guaranteed Obligations resulting from such payment by such Guarantor.

    Section 9.06 <u>Reinstatement</u>.  Notwithstanding anything to contrary contained in this Agreement, each of the Guarantors agrees that (a) its guarantee hereunder shall continue to be effective or be reinstated, as the case may be, if at any time payment, or any part thereof, of any Guaranteed Obligation is rescinded or must otherwise be restored by the Agent or any Lender upon the bankruptcy or reorganization (or any analogous proceeding in any jurisdiction) of the Borrower or any other Guarantor or otherwise and (b) the provisions of this Section 9.06 shall survive the termination of this Agreement.

**ARTICLE X**

**MISCELLANEOUS**

    Section 10.01  <u>Notices, Etc</u>.  (a) All notices and other communications provided for hereunder shall be in writing and shall be mailed (certified mail, postage prepaid and return receipt requested), telecopied or delivered by hand, Federal Express or other reputable overnight courier, if to any Loan Party, at the following address:

    _____
    _____
    _____

    Attention:  Chief Financial Officer
    Telephone:  _____
    Telecopier:  _____

    with copies to _____

    if to the Agent, to it at the following address:

    U.S. Bank Corporate Trust Services
    214 North Tryon Street, 26th floor
    Charlotte, NC 28202,_____
    Attention:CDO Trust Services
    Telephone:
    Telecopier:704-335-4678

with copies (which shall not constitute notice to the Agent) to:

Pillsbury Winthrop Shaw Pittman LLP
1540 Broadway
New York, New York 10036
Attention: Bart Pisella, Esq. (bart.pisella@pillsburylaw.com) and
Timothy Kober, Esq. (timothy.kober@pillsburylaw.com)

or, as to each party, at such other address as shall be designated by such party in a written notice to the other parties complying as to delivery with the terms of this Section 10.01. All such notices and other communications shall be effective, (i) if mailed (certified mail, postage prepaid and return receipt requested), when received or three (3) days after deposited in the mails, whichever occurs first, (ii) if telecopied, when transmitted and confirmation received, or (iii) if delivered by hand, Federal Express or other reputable overnight courier, upon delivery, except that notices to the Agent pursuant to ARTICLE II shall not be effective until received by the Agent.

(b)    Electronic Communications.

(i)    The Agent and the Borrower may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it; provided that approval of such procedures may be limited to particular notices or communications.

(ii)    Unless the Agent otherwise prescribes, (A) notices and other communications sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgement from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgement), and (B) notices or communications posted to an Internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient, at its e-mail address as described in the foregoing clause (A), of notification that such notice or communication is available and identifying the website address therefor; provided that, for both clauses (A) and (B) above, if such notice, email or other communication is not sent during the normal business hours of the recipient, such notice or communication shall be deemed to have been sent at the opening of business on the next business day for the recipient.

Section 10.02 Amendments, Etc. (a) No amendment or waiver of any provision of this Agreement, and no consent to any departure by any Loan Party therefrom, shall in any event be effective unless the same shall be in writing and signed by the Required Lenders or by the Agent with the written consent of the Required Lenders, and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given, provided, however, that no amendment, waiver or consent shall (i) increase the Commitment of any Lender, reduce the principal of, or interest on, the Loans payable to any Lender, reduce the amount of any fee payable for the account of any Lender, or postpone or extend any scheduled date fixed for any payment of principal of, or interest or fees on, the Loans payable to any Lender, in each case without the written consent of each Lender affected thereby, (ii) increase the Total Term Loan A Commitment, the Total Term Loan A-1 Commitment or the Total Term

Loan B Commitment without the written consent of each Lender, (iii) change the percentage of the Commitments or of the aggregate unpaid principal amount of the Loans that is required for the Lenders or any of them to take any action hereunder without the written consent of each Lender, (iv) amend the definition of "Required Lenders" or "Pro Rata Share" without the written consent of each Lender, (v) release all or a substantial portion of the Collateral (except as otherwise provided in this Agreement and the other Loan Documents), subordinate any Lien granted in favor of the Agent for the benefit of the Agent and the Lenders, or release the Borrower or any Guarantor without the written consent of each Lender, or (vi) amend, modify or waive Section 2.05(d), Section 3.03, this Section 10.02 or Section 10.07 of this Agreement without the written consent of each Lender; provided, further, that no amendment, waiver or consent shall (x) amend, modify or waive Section 2.01(a)(ii) or Section 2.01(a)(iii), of this Agreement without the written consent of each Lender with a Term Loan A-1 Commitment or a Term Loan A-1 Loan in addition to the written consent of the Required Lenders, or (y) amend the definition of "Final Term Loan A-1 Maturity Date", "Term Loan A-1", "Term Loan A-1 Commitment", "Term Loan A-1 Commitment Termination Date", "Total Term Loan A-1 Commitment", or Schedule 1.01(A) with respect to the Term Loan A-1 Commitments, without the written consent of each Lender with a Term Loan A-1 Commitment or a Term A-1 Loan in addition to the written consent of the Required Lenders. Notwithstanding the foregoing, no amendment, waiver or consent shall, unless in writing and signed by the Agent, affect the rights or duties of the Agent (but not in its capacity as a Lender) under this Agreement or the other Loan Documents. Solely for the purposes of voting or consenting to matters with respect to the Loan Documents, a Defaulting Lender shall be deemed not to be a "Lender" and such Lender's Commitment shall be deemed to be zero, except for purposes of voting or consenting on matters described in (i), (ii), (iii), (iv) or (vi) above.

(b)     If any action to be taken by the Lenders hereunder requires the consent, authorization, or agreement of all of the Lenders or any Lender affected thereby, and a Lender other than the Agent and its respective Affiliates and Related Funds (the "Holdout Lender") fails to give its consent, authorization, or agreement, then the Agent at the written direction of the Required Lenders, upon at least 5 Business Days prior irrevocable notice to the Holdout Lender, may permanently replace the Holdout Lender with one or more substitute Replacement Lenders, and the Holdout Lender shall have no right to refuse to be replaced hereunder. Such notice to replace the Holdout Lender shall specify an effective date for such replacement, which date shall not be later than 15 Business Days after the date such notice is given. Prior to the effective date of such replacement, the Holdout Lender and each Replacement Lender shall execute and deliver an Assignment and Acceptance, subject only to the Holdout Lender being repaid its share of the outstanding Obligations without any premium or penalty of any kind whatsoever. If the Holdout Lender shall refuse or fail to execute and deliver any such Assignment and Acceptance prior to the effective date of such replacement, the Holdout Lender shall be deemed to have executed and delivered such Assignment and Acceptance. The replacement of any Holdout Lender shall be made in accordance with the terms of Section 10.07(b). Until such time as the Replacement Lenders shall have acquired all of the Obligations, the Commitments, and the other rights and obligations of the Holdout Lender hereunder and under the other Loan Documents, the Holdout Lender shall remain obligated to make its Pro Rata Share of Loans.

(c)     With respect to any matter set forth on Schedule 10.02(c) hereto, to the extent the Agent asks for a determination or direction from any Lender, each Lender agrees that it will not unreasonably delay its response (it being understood that each Lender shall have been provided by the Borrower and/or Agent, to the extent applicable, sufficient information in the reasonable discretion of such Lender to make such determination, or to provide such direction).

Section 10.03  No Waiver; Remedies, Etc.  No failure on the part of the Agent or any Lender to exercise, and no delay in exercising, any right hereunder or under any other Loan Document shall operate as a waiver thereof; nor shall any single or partial exercise of any right under any Loan Document preclude any other or further exercise thereof or the exercise of any other right. The rights and remedies of the Agent and the Lenders provided herein and in the other Loan Documents are cumulative and are in addition to, and not exclusive of, any rights or remedies provided by law. The rights of the Agent and the Lenders under any Loan Document against any party thereto are not conditional or contingent on any attempt by the Agent and the Lenders to exercise any of their rights under any other Loan Document against such party or against any other Person.

Section 10.04  Expenses; Taxes; Attorneys' Fees.  The Borrower will pay on demand all costs and expenses set forth in clauses (i) through (x) below incurred by or on behalf of: (a) the Agent (including, periodic field audits, investigations, searches and filings, monitoring of assets, appraisals of Collateral, miscellaneous disbursements, examination, travel, lodging and meals, but excluding the fees, costs and expenses of any legal counsel to the Agent in connection with any work prior to the Effective Date), and (b) each Lender (limited, in the case of costs and expenses of legal counsel (A) absent an Event of Default, to the reasonable fees, costs, client charges and expenses of: one outside transactional legal counsel for the Lenders, and, to the extent reasonably required by the Lenders, one outside legal counsel to the Lenders in each relevant local jurisdiction, and (B) at any time after the occurrence and during the continuance of an Event of Default, to the reasonable fees, costs, client charges and expenses of one outside transactional legal counsel for each Lender, one outside regulatory legal counsel for each Lender, and, to the extent reasonably required by such Lender, one outside legal counsel to each Lender in each relevant local jurisdiction), in each case, arising from or relating to: (i) the performance and administration of this Agreement and the other Loan Documents (including, without limitation, the preparation of any additional Loan Documents pursuant to Section 6.01(b) or the review of any agreements, instruments and documents), (ii) any requested amendments, waivers or consents to this Agreement or the other Loan Documents whether or not such documents become effective or are given, (iii) the preservation and protection of the Agent's or any of the Lenders' rights under this Agreement or the other Loan Documents, (iv) the defense of any claim or action asserted or brought against the Agent or any Lender by any Person that arises from or relates to this Agreement, any other Loan Document, the Agent's or the Lenders' claims against any Loan Party, or any and all matters in connection therewith, (v) the commencement or defense of, or intervention in, any court proceeding arising from or related to this Agreement or any other Loan Document, (vi) the filing of any petition, complaint, answer, motion or other pleading by the Agent or any Lender, or the taking of any action in respect of the Collateral or other security, in connection with this Agreement or any other Loan Document, (vii) the protection, collection, lease, sale, taking possession of or liquidation of, any Collateral or other security in connection with this Agreement or any other Loan Document, (viii) any attempt to

enforce any Lien or security interest in any Collateral or other security in connection with this Agreement or any other Loan Document, (ix) any attempt to collect from any Loan Party, or (x) the receipt by the Agent or any Lender of any advice from professionals with respect to any of the foregoing. Without limitation of the foregoing or any other provision of any Loan Document: (x) the Borrower agrees to pay all stamp, document, transfer, recording or filing taxes or fees and similar impositions now or hereafter determined by the Agent or any Lender to be payable in connection with this Agreement or any other Loan Document, and the Borrower agrees to save the Agent and each Lender harmless from and against any and all present or future claims, liabilities or losses with respect to or resulting from any omission to pay or delay in paying any such taxes, fees or impositions, and (y) if the Borrower fails to perform any covenant or agreement contained herein or in any other Loan Document, the Agent may perform or cause performance of such covenant or agreement, and the expenses of the Agent incurred in connection therewith shall be reimbursed on demand by the Borrower. The Borrower also agrees to pay any costs and expenses incurred by a Qualified Valuation Firm selected to prepare a valuation report in connection with any Independent Valuation Process conducted pursuant to this Agreement. For the avoidance of doubt, Borrower and Lenders agree that any and all fees and expenses (including, without limitation, fees and expenses of legal counsel) incurred by a party before the Effective Date will be the sole responsibility of the party incurring such fees and expenses, and Borrower has no obligation under this Section 10.04 to reimburse Lenders for fees and expenses incurred before the Effective Date. The obligations of the Borrower under this Section 10.04 shall survive the repayment of the Obligations and discharge of any Liens granted under the Loan Documents.

Section 10.05 <u>Right of Set-off</u>. Upon the occurrence and during the continuance of any Event of Default, the Agent or any Lender may, and is hereby authorized to, at any time and from time to time, without notice to any Loan Party (any such notice being expressly waived by the Loan Parties) and to the fullest extent permitted by law, set off and apply any and all deposits (general or special, time or demand, provisional or final) at any time held and other Indebtedness at any time owing by the Agent or such Lender to or for the credit or the account of any Loan Party against any and all obligations of the Loan Parties either now or hereafter existing under any Loan Document, irrespective of whether or not the Agent or such Lender shall have made any demand hereunder or thereunder and although such obligations may be contingent or unmatured; provided that in the event that any Defaulting Lender shall exercise any such right of setoff, (x) all amounts so set off shall be paid over immediately to the Agent for further application in accordance with the provisions of Section 3.02 and, pending such payment, shall be segregated by such Defaulting Lender from its other funds and deemed held in trust for the benefit of the Agent and the Lenders, and (y) the Defaulting Lender shall provide promptly to the Agent a statement describing in reasonable detail the Obligations owing to such Defaulting Lender as to which it exercised such right of setoff. The Agent and each Lender agrees to notify such Loan Party promptly after any such set-off and application made by the Agent or such Lender provided that the failure to give such notice shall not affect the validity of such set-off and application. The rights of the Agent and the Lenders under this Section 10.05 are in addition to the other rights and remedies (including other rights of set-off) which the Agent and the Lenders may have under this Agreement or any other Loan Documents of law or otherwise.

Section 10.06 <u>Severability</u>. Any provision of this Agreement which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the

extent of such prohibition or unenforceability without invalidating the remaining portions hereof or affecting the validity or enforceability of such provision in any other jurisdiction.

Section 10.07  Assignments and Participations.

(a)  This Agreement and the other Loan Documents shall be binding upon and inure to the benefit of each Loan Party and the Agent and each Lender and their respective successors and assigns; provided, however, that none of the Loan Parties may assign or transfer any of its rights hereunder or under the other Loan Documents without the prior written consent of each Lender and any such assignment without the Lenders' prior written consent shall be null and void.

(b)  Each Lender may with the written consent of the Agent (not to be unreasonably withheld), and so long as no Default or Event of Default shall have occurred and be continuing, with the written consent of the Borrower (not to be unreasonably withheld, delayed or conditioned), assign to one or more other lenders or other entities all or a portion of its rights and obligations under this Agreement with respect to all or a portion of its Commitment and any Loan made by it; provided, however, that (i) such assignment is in an amount which is at least $1,000,000 or a multiple of $1,000,000 in excess thereof (or the remainder of such Lender's Commitment) (except such minimum amount shall not apply to an assignment by a Lender to (x) another Lender, an Affiliate of such Lender or a Related Fund of such Lender or (y) a group of new Lenders, each of whom is an Affiliate or Related Fund of each other to the extent the aggregate amount to be assigned to all such new Lenders is at least $1,000,000 or a multiple of $1,000,000 in excess thereof), (ii) the parties to each such assignment shall execute and deliver to the Agent, for its acceptance, an Assignment and Acceptance, together with any promissory note subject to such assignment and such parties shall deliver to the Agent, for the benefit of the Agent, a processing and recordation fee of $3,500 (except the payment of such fee shall not be required in connection with an assignment by a Lender to another Lender, an Affiliate of such Lender or a Related Fund of such Lender) and (iii) no written consent of the Agent or the Borrower shall be required (1) in connection with any assignment by a Lender to another Lender, an Affiliate of such Lender or a Related Fund of such Lender or (2) if such assignment is in connection with any merger, consolidation, sale, transfer, or other disposition of all or any substantial portion of the business or loan portfolio of such Lender.  Upon such execution, delivery and acceptance, from and after the effective date specified in each Assignment and Acceptance and recordation on the Register, which effective date shall be at least 3 Business Days after the delivery thereof to the Agent (or such shorter period as may be agreed to by the Agent and the parties to such assignment), (A) the assignee thereunder shall become a "Lender" hereunder and, in addition to the rights and obligations hereunder held by it immediately prior to such effective date, have the rights and obligations hereunder that have been assigned to it pursuant to such Assignment and Acceptance and (B) the assigning Lender thereunder shall, to the extent that rights and obligations hereunder have been assigned by it pursuant to such Assignment and Acceptance, relinquish its rights and be released from its obligations under this Agreement (and, in the case of an Assignment and Acceptance covering all or the remaining portion of an assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto).  No assignment shall be made to (i) the Borrower or any of its Affiliates or Subsidiaries or (ii) to any Defaulting Lender or any of its Subsidiaries,

or any Person who, upon becoming a Lender hereunder, would constitute any of the foregoing Persons. In connection with any assignment of rights and obligations of any Defaulting Lender hereunder, no such assignment shall be effective unless and until, in addition to the other conditions thereto set forth herein, the parties to the assignment shall make such additional payments to the Agent in an aggregate amount sufficient, upon distribution thereof as appropriate (which may be outright payment, purchases by the assignee of participations or subparticipations, or other compensating actions, including funding, with the consent of the Borrower and the Agent, the applicable pro rata share of Loans previously requested but not funded by the Defaulting Lender, to each of which the applicable assignee and assignor hereby irrevocably consent), to (x) pay and satisfy in full all payment liabilities then owed by such Defaulting Lender to the Agent and each other Lender hereunder (and interest accrued thereon), and (y) acquire (and fund as appropriate) its full pro rata share of all Loans in accordance with its Pro Rata Share. Notwithstanding the foregoing, in the event that any assignment of rights and obligations of any Defaulting Lender hereunder shall become effective under applicable law without compliance with the provisions of this paragraph, then the assignee of such interest shall be deemed to be a Defaulting Lender for all purposes of this Agreement until such compliance occurs.

(c)     By executing and delivering an Assignment and Acceptance, the assigning Lender and the assignee thereunder confirm to and agree with each other and the other parties hereto as follows: (i) other than as provided in such Assignment and Acceptance, the assigning Lender makes no representation or warranty and assumes no responsibility with respect to any statements, warranties or representations made in or in connection with this Agreement or any other Loan Document or the execution, legality, validity, enforceability, genuineness, sufficiency or value of this Agreement or any other Loan Document furnished pursuant hereto; (ii) the assigning Lender makes no representation or warranty and assumes no responsibility with respect to the financial condition of any Loan Party or any of its Subsidiaries or the performance or observance by any Loan Party of any of its obligations under this Agreement or any other Loan Document furnished pursuant hereto; (iii) such assignee confirms that it has received a copy of this Agreement and the other Loan Documents, together with such other documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into such Assignment and Acceptance; (iv) such assignee will, independently and without reliance upon the assigning Lender, the Agent or any Lender and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under this Agreement and the other Loan Documents; (v) such assignee appoints and authorizes the Agent to take such action as agent on its behalf and to exercise such powers under this Agreement and the other Loan Documents as are delegated to the Agent by the terms hereof and thereof, together with such powers as are reasonably incidental hereto and thereto; and (vi) such assignee agrees that it will perform in accordance with their terms all of the obligations which by the terms of this Agreement and the other Loan Documents are required to be performed by it as a Lender.

(d)     The Agent shall, acting solely for this purpose as a non-fiduciary agent of the Borrower, maintain, or cause to be maintained at the Payment Office, a copy of each Assignment and Acceptance delivered to and accepted by it and a register (the "Register") for the recordation of the names and addresses of the Lenders and the

Commitments of, and the principal amount of the Loans (and stated interest thereon) (the "Registered Loans") owing to each Lender from time to time. The entries in the Register shall be conclusive and binding for all purposes, absent manifest error, and the Borrower, the Agent and the Lenders may treat each Person whose name is recorded in the Register as a Lender hereunder for all purposes of this Agreement. The Register shall be available for inspection by the Borrower and any Lender at any reasonable time and from time to time upon reasonable prior written notice.

(e)     Upon receipt by the Agent of a completed Assignment and Acceptance, and subject to any consent required from the Agent pursuant to Section 10.07(b) (which consent of the Agent must be evidenced by the Agent's execution of an acceptance to such Assignment and Acceptance), the Agent shall accept such assignment and record the information contained therein in the Register.

(f)     A Registered Loan (and the registered note, if any, evidencing the same) may be assigned or sold in whole or in part only by registration of such assignment or sale on the Register (and each registered note shall expressly so provide). Any assignment or sale of all or part of such Registered Loan (and the registered note, if any, evidencing the same) may be effected only by registration of such assignment or sale on the Register, together with the surrender of the registered note, if any, evidencing the same duly endorsed by (or accompanied by a written instrument of assignment or sale duly executed by) the holder of such registered note, whereupon, at the request of the designated assignee(s) or transferee(s), one or more new registered notes in the same aggregate principal amount shall be issued to the designated assignee(s) or transferee(s). Prior to the registration of assignment or sale of any Registered Loan (and the registered note, if any, evidencing the same), the Agent shall treat the Person in whose name such Registered Loan (and the registered note, if any, evidencing the same) is registered on the Register as the owner thereof for the purpose of receiving all payments thereon, notwithstanding notice to the contrary.

(g)     In the event that any Lender sells participations in a Registered Loan, such Lender shall, acting for this purpose as a non-fiduciary agent on behalf of the Borrower, maintain, or cause to be maintained, a register, on which it enters the name of all participants in the Registered Loans held by it and the principal amount (and stated interest thereon) of the portion of the Registered Loan that is the subject of the participation (the "Participant Register"). A Registered Loan (and the registered note, if any, evidencing the same) may be participated in whole or in part only by registration of such participation on the Participant Register (and each registered note shall expressly so provide). Any participation of such Registered Loan (and the registered note, if any, evidencing the same) may be effected only by the registration of such participation on the Participant Register. The Participant Register shall be available for inspection by the Borrower and any Lender at any reasonable time and from time to time upon reasonable prior written notice.

(h)     Any Non-U.S. Lender who purchases or is assigned or participates in any portion of such Registered Loan shall comply with Section 2.07(e).

(i)     Each Lender may sell participations to one or more banks or other entities in or to all or a portion of its rights and obligations under this Agreement and the

other Loan Documents (including, without limitation, all or a portion of its Term Loan A Commitment, Term Loan A-1 Commitment and/or Term Loan B Commitment and the Loans made by it); provided, that (i) such Lender's obligations under this Agreement (including without limitation, its Term Loan A Commitment, Term Loan A-1 Commitment and/or Term Loan B Commitment hereunder) and the other Loan Documents shall remain unchanged; and (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations, and the Borrower, the Agent and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement and the other Loan Documents. The Loan Parties agree that each participant shall be entitled to the benefits of Section 2.07 of this Agreement with respect to its participation in any portion of the Commitments and the Loans as if it was a Lender; provided, that no participant may receive a greater benefit than the Lender from whom such participant acquired its interest would have received.

(j)     Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank or loans made to such Lender pursuant to securitization or similar credit facility (a "Securitization"); provided that no such pledge or assignment shall release such Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto. The Loan Parties shall cooperate with such Lender and its Affiliates to effect the Securitization including, without limitation, by providing such information as may be reasonably requested by such Lender in connection with the rating of its Loans or the Securitization.

Section 10.08  Counterparts.  This Agreement may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which shall be deemed to be an original, but all of which taken together shall constitute one and the same agreement. Delivery of an executed counterpart of this Agreement by telefacsimile or electronic mail shall be equally as effective as delivery of an original executed counterpart of this Agreement. Any party delivering an executed counterpart of this Agreement by telefacsimile or electronic mail also shall deliver an original executed counterpart of this Agreement but the failure to deliver an original executed counterpart shall not affect the validity, enforceability, and binding effect of this Agreement. The foregoing shall apply to each other Loan Document *mutatis mutandis.*

Section 10.09  GOVERNING LAW.  THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS (UNLESS EXPRESSLY PROVIDED TO THE CONTRARY IN ANOTHER LOAN DOCUMENT IN RESPECT OF SUCH OTHER LOAN DOCUMENT) SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND TO BE PERFORMED IN THE STATE OF NEW YORK.

Section 10.10  CONSENT TO JURISDICTION; SERVICE OF PROCESS AND VENUE.  ANY LEGAL ACTION OR PROCEEDING WITH RESPECT TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT MAY BE BROUGHT IN THE COURTS OF THE STATE OF NEW YORK IN THE COUNTY OF NEW YORK OR OF THE

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK, AND, BY EXECUTION AND DELIVERY OF THIS AGREEMENT, EACH LOAN PARTY HEREBY IRREVOCABLY ACCEPTS IN RESPECT OF ITS PROPERTY, GENERALLY AND UNCONDITIONALLY, THE JURISDICTION OF THE AFORESAID COURTS. EACH LOAN PARTY HEREBY IRREVOCABLY APPOINTS THE SECRETARY OF STATE OF THE STATE OF NEW YORK AS ITS AGENT FOR SERVICE OF PROCESS IN RESPECT OF ANY SUCH ACTION OR PROCEEDING AND FURTHER IRREVOCABLY CONSENTS TO THE SERVICE OF PROCESS OUT OF ANY OF THE AFOREMENTIONED COURTS AND IN ANY SUCH ACTION OR PROCEEDING BY THE MAILING OF COPIES THEREOF BY REGISTERED OR CERTIFIED MAIL, POSTAGE PREPAID, TO THE BORROWER AT ITS ADDRESS FOR NOTICES AS SET FORTH IN SECTION 10.01 AND TO THE SECRETARY OF STATE OF THE STATE OF NEW YORK, SUCH SERVICE TO BECOME EFFECTIVE TEN (10) DAYS AFTER SUCH MAILING. THE LOAN PARTIES AGREE THAT A FINAL JUDGMENT IN ANY SUCH ACTION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW. NOTHING HEREIN SHALL AFFECT THE RIGHT OF THE AGENT AND THE LENDERS TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR TO COMMENCE LEGAL PROCEEDINGS OR OTHERWISE PROCEED AGAINST ANY LOAN PARTY IN ANY OTHER JURISDICTION. EACH LOAN PARTY HEREBY EXPRESSLY AND IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY OBJECTION WHICH IT MAY NOW OR HEREAFTER HAVE TO THE JURISDICTION OR LAYING OF VENUE OF ANY SUCH LITIGATION BROUGHT IN ANY SUCH COURT REFERRED TO ABOVE AND ANY CLAIM THAT ANY SUCH LITIGATION HAS BEEN BROUGHT IN AN INCONVENIENT FORUM. TO THE EXTENT THAT ANY LOAN PARTY HAS OR HEREAFTER MAY ACQUIRE ANY IMMUNITY FROM JURISDICTION OF ANY COURT OR FROM ANY LEGAL PROCESS (WHETHER THROUGH SERVICE OR NOTICE, ATTACHMENT PRIOR TO JUDGMENT, ATTACHMENT IN AID OF EXECUTION OR OTHERWISE) WITH RESPECT TO ITSELF OR ITS PROPERTY, EACH LOAN PARTY HEREBY IRREVOCABLY WAIVES SUCH IMMUNITY IN RESPECT OF ITS OBLIGATIONS UNDER THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS.

Section 10.11 WAIVER OF JURY TRIAL, ETC. EACH LOAN PARTY, THE AGENT AND EACH LENDER HEREBY WAIVES ANY RIGHT TO A TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM CONCERNING ANY RIGHTS UNDER THIS AGREEMENT OR THE OTHER LOAN DOCUMENTS, OR UNDER ANY AMENDMENT, WAIVER, CONSENT, INSTRUMENT, DOCUMENT OR OTHER AGREEMENT DELIVERED OR WHICH IN THE FUTURE MAY BE DELIVERED IN CONNECTION THEREWITH, OR ARISING FROM ANY FINANCING RELATIONSHIP EXISTING IN CONNECTION WITH THIS AGREEMENT, AND AGREES THAT ANY SUCH ACTION, PROCEEDINGS OR COUNTERCLAIM SHALL BE TRIED BEFORE A COURT AND NOT BEFORE A JURY. EACH LOAN PARTY CERTIFIES THAT NO OFFICER, REPRESENTATIVE, AGENT OR ATTORNEY OF THE AGENT OR ANY LENDER HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT THE AGENT OR ANY LENDER WOULD NOT, IN THE EVENT OF ANY ACTION, PROCEEDING OR COUNTERCLAIM, SEEK TO ENFORCE THE FOREGOING WAIVERS. EACH LOAN PARTY HEREBY ACKNOWLEDGES THAT THIS PROVISION IS A MATERIAL

INDUCEMENT FOR THE AGENT AND THE LENDERS ENTERING INTO THIS AGREEMENT.

Section 10.12 <u>Consent by the Agent and Lenders</u>. Except as otherwise expressly set forth herein to the contrary or in any other Loan Document, if the consent, approval, satisfaction, determination, judgment, acceptance or similar action (an "<u>Action</u>") of the Agent or any Lender shall be permitted or required pursuant to any provision hereof or any provision of any other agreement to which any Loan Party is a party and to which the Agent or any Lender has succeeded thereto, such Action shall be required to be in writing and may be withheld or denied by the Agent or such Lender, in its sole discretion, with or without any reason, and without being subject to question or challenge on the grounds that such Action was not taken in good faith.

Section 10.13 <u>No Party Deemed Drafter</u>. Each of the parties hereto agrees that no party hereto shall be deemed to be the drafter of this Agreement.

Section 10.14 <u>Reinstatement; Certain Payments</u>. If any claim is ever made upon the Agent or any Lender for repayment or recovery of any amount or amounts received by the Agent or such Lender in payment or on account of any of the Obligations, the Agent or such Lender shall give prompt notice of such claim to each other Agent and Lender and the Borrower, and if the Agent or such Lender repays all or part of such amount by reason of (i) any judgment, decree or order of any court or administrative body having jurisdiction over the Agent or such Lender or any of its property, or (ii) any good faith settlement or compromise of any such claim effected by the Agent or such Lender with any such claimant, then and in such event each Loan Party agrees that (A) any such judgment, decree, order, settlement or compromise shall be binding upon it notwithstanding the cancellation of any Indebtedness hereunder or under the other Loan Documents or the termination of this Agreement or the other Loan Documents, and (B) it shall be and remain liable to the Agent or such Lender hereunder for the amount so repaid or recovered to the same extent as if such amount had never originally been received by the Agent or such Lender.

Section 10.15 <u>Indemnification; Limitation of Liability for Certain Damages</u>.

(a)    In addition to each Loan Party's other Obligations under this Agreement, each Loan Party agrees to, jointly and severally, defend, protect, indemnify and hold harmless the Agent and each Lender and all of their respective Affiliates, officers, directors, employees, attorneys, consultants and agents (collectively called the "<u>Indemnitees</u>") from and against any and all losses, damages, liabilities, obligations, penalties, fees, reasonable costs and expenses (including, without limitation, reasonable attorneys' fees, costs and expenses) incurred by such Indemnitees, whether prior to or from and after the Effective Date, whether direct, indirect or consequential, as a result of or arising from or relating to or in connection with any of the following: (i) the negotiation, preparation, execution or performance or enforcement of this Agreement, any other Loan Document or of any other document executed in connection with the transactions contemplated by this Agreement, (ii) the Agent's or any Lender's furnishing of funds to the Borrower under this Agreement or the other Loan Documents, including, without limitation, the management of any such Loans, (iii) any matter relating to the financing transactions contemplated by this Agreement or the other

Loan Documents or by any document executed in connection with the transactions contemplated by this Agreement or the other Loan Documents, or (iv) any claim, litigation, investigation or proceeding relating to any of the foregoing, whether or not any Indemnitee is a party thereto (collectively, the "Indemnified Matters"); provided, however, that the Loan Parties shall not have any obligation to any Indemnitee under this subsection (a) for any Indemnified Matter caused by the gross negligence or willful misconduct of such Indemnitee (or, in the case of an Indemnitee that is a Defaulting Lender, caused by a material breach by such Defaulting Lender of its obligations hereunder), as determined by a final non-appealable judgment of a court of competent jurisdiction.

(b)     The indemnification for all of the foregoing losses, damages, fees, costs and expenses of the Indemnitees set forth in this Section 10.15 are chargeable against the loan account. To the extent that the undertaking to indemnify, pay and hold harmless set forth in this Section 10.15 may be unenforceable because it is violative of any law or public policy, each Loan Party shall, jointly and severally, contribute the maximum portion which it is permitted to pay and satisfy under applicable law, to the payment and satisfaction of all Indemnified Matters incurred by the Indemnitees.

(c)     No Loan Party shall assert, and each Loan Party hereby waives, any claim against the Indemnitees, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) (whether or not the claim therefor is based on contract, tort or duty imposed by any applicable legal requirement) arising out of, in connection with, as a result of, or in any way related to, this Agreement or any other Loan Document or any agreement or instrument contemplated hereby or thereby or referred to herein or therein, the transactions contemplated hereby or thereby, any Loan or the use of the proceeds thereof or any act or omission or event occurring in connection therewith, and each Loan Party hereby waives, releases and agrees not to sue upon any such claim or seek any such damages, whether or not accrued and whether or not known or suspected to exist in its favor.

(d)     The indemnities and waivers set forth in this Section 10.15 shall survive the repayment of the Obligations and discharge of any Liens granted under the Loan Documents and the earlier resignation or removal of the Agent.

Section 10.16  Records.  The unpaid principal of and interest on the Loans, the interest rate or rates applicable to such unpaid principal and interest, the duration of such applicability, the Commitments, and the accrued and unpaid fees payable pursuant to Section 2.06 hereof, including, without limitation, the Funding Fee, shall at all times be ascertained from the records of the Agent, which shall be conclusive and binding absent manifest error.

Section 10.17  Binding Effect.  This Agreement shall become effective when it shall have been executed by each Loan Party, the Agent and each Lender and when the conditions precedent set forth in Section 4.01 hereof have been satisfied or waived in writing by the Agent, and thereafter shall be binding upon and inure to the benefit of each Loan Party, the Agent and each Lender, and their respective successors and assigns, except that the Loan Parties shall not have the right to assign their rights hereunder or any interest herein without the prior

written consent of the Agent and each Lender, and any assignment by any Lender shall be governed by Section 10.07 hereof.

Section 10.18 <u>Confidentiality</u>. Borrower shall provide all information required hereunder regarding the Loan Parties and any Insurance Subsidiary and their businesses, including all information in connection with any waivers, amendments or approvals or otherwise requiring a determination by a Lender, the Lenders or the Required Lenders, directly to the Agent (such information, excluding information obtained by the Agent from publicly available sources, "Private Side Information"). Each Lender that wishes to receive Private Side Information will designate at least one individual to receive the Private Side Information and identify such designee to the Agent (each such designee, a "Private Sider"). The Lenders hereby agree that at all times there will be at least one Lender who has designated a Private Sider. Each Loan Party hereby authorizes the Agent to distribute all Private Side Information from the Borrower to Private Siders; it being understood that employees and representatives of a Lender who have not been designated as Private Siders may be engaged in investment and other market-related activities with respect to Borrower's or its affiliates' securities. In the event less than all of the Lenders have designated a Private Sider, then, in connection with any Required Lender determination under Section 10.02 or any action taken or not taken hereunder or otherwise subject to a Required Lender determination for which Private Side Information is material in the consideration of any such determination, those Lenders who have not designated a Private Sider and not voted shall be deemed to have voted in the same manner as those Lenders who have designated a Private Sider and whose Pro Rata Shares represents more than 50% of the Pro Rata Shares of such Lenders; provided that no such determination, action or non-action shall result in any Lender being treated differently than any other Lender.

Section 10.19 <u>Public Disclosure</u>. Each Loan Party agrees that neither it nor any of its Affiliates will now or in the future issue any press release or other public disclosure using the name of an Agent, any Lender or any of their respective Affiliates or referring to this Agreement or any other Loan Document without the prior written consent of the Agent or such Lender, except to the extent that such Loan Party or such Affiliate is required to do so under applicable law (in which event, such Loan Party or such Affiliate will consult with the Agent or such Lender before issuing such press release or other public disclosure); <u>provided,</u> that no consent shall be required for the Borrower to comply with its filing and disclosure requirements with the SEC. Each Loan Party hereby authorizes the Agent and each Lender, after consultation with the Borrower, to advertise the closing of the transactions contemplated by this Agreement, and to make appropriate announcements of the financial arrangements entered into among the parties hereto, as the Agent or such Lender shall deem appropriate, including, without limitation, announcements commonly known as tombstones, in such trade publications, business journals, newspapers of general circulation and to such selected parties as the Agent or such Lender shall deem appropriate.

Section 10.20 <u>Integration</u>. This Agreement, together with the other Loan Documents, reflects the entire understanding of the parties with respect to the transactions contemplated hereby and shall not be contradicted or qualified by any other agreement, oral or written, before the date hereof. As to the duties or obligations of the Agent, in the event of any conflict between this Agreement and any other Loan Document, the terms of this Agreement shall govern and control.

Section 10.21  <u>USA PATRIOT Act</u>. Each Lender that is subject to the requirements of the USA PATRIOT Act hereby notifies the Borrower that pursuant to the requirements of the USA PATRIOT Act, it is required to obtain, verify and record information that identifies the entities composing the Loan Parties, which information includes the name and address of each such entity and other information that will allow such Lender to identify the entities composing the Loan Parties in accordance with the USA PATRIOT Act. Each Loan Party agrees to take such action and execute, acknowledge and deliver at its sole cost and expense, such instruments and documents as any Lender may reasonably require from time to time in order to enable such Lender to comply with the USA PATRIOT Act.

[REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective officers thereunto duly authorized, as of the date first above written.

BORROWER:

[REORGANIZED WMI]

By: _____
        Name:
        Title:

GUARANTOR(S):

[_____]

By: _____
        Name:
        Title:

AGENT:

U.S. BANK NATIONAL ASSOCIATION, as Agent

By: _____
        Name:
        Title:

**LENDERS:**

OWL CREEK ASIA I, L.P.

By: Owl Creek Advisors, LLC, its general partner

By: _____
    Name: _____
    Title: _____

OWL CREEK ASIA II, L.P.

By: Owl Creek Advisors, LLC, its general partner

By: _____
    Name: _____
    Title: _____

OWL CREEK ASIA MASTER FUND, LTD.

By: _____
    Name: _____
    Title: _____

OWL CREEK I, L.P.

By: Owl Creek Advisors, LLC, its general partner

By: _____
    Name: _____
    Title: _____

OWL CREEK II, L.P.

By:  Owl Creek Advisors, LLC, its general partner


By: _____
     Name: _____
     Title: _____


OWL CREEK OVERSEAS MASTER FUND,
LTD.


By: _____
     Name: _____
     Title: _____


OWL CREEK SRI MASTER FUND, LTD.


By: _____
     Name: _____
     Title: _____

APPALOOSA INVESTMENT L.P. I

By:  Appaloosa Management L.P., its general partner

By:  Appaloosa Partners Inc., its general partner

By:  _____
    Name:  _____
    Title:  _____

THOROUGHBRED FUND L.P.

By:  Appaloosa Management L.P., its general partner

By:  Appaloosa Partners Inc., its general partner

By:  _____
    Name:  _____
    Title:  _____

AURELIUS CAPITAL PARTNERS, LP

By:  Aurelius Capital GP, LLC, its General Partner

By:  _____
    Name:  Dan Gropper
    Title:  Managing Director

AURELIUS INVESTMENT, LLC

By:  Aurelius Capital Management, LP, solely as
its manager and not in its individual capacity

By:  _____
    Name:  Dan Gropper
    Title:  Managing Director

CENTERBRIDGE SPECIAL PARTNERS, L.P.

By: _____
    Name: _____
    Title: _____

CENTERBRIDGE CREDIT PARTNERS, L.P.

By: _____
    Name: _____
    Title: _____

CENTERBRIDGE CREDIT PARTNERS
MASTER, L.P.

By: _____
    Name: _____
    Title: _____

**EXHIBIT D**

**PIERS CLAIMS**

| Notes Issuance | Maturity Date | Allowed Principal | Allowed Accrued Interest[7] | Allowed Total Amount | Post-Petition Interest at the Federal Judgment Rate[8] | Post-Petition Interest Pursuant to Contractual Subordination[9] |
|---|---|---|---|---|---|---|
| **5.375% Junior Subordinated Deferrable Interest Debentures** | | | | | | |
| **Preferred Securities** | May 1, 2041 | $756,230,623.24 | $9,443,576.39 | $765,674,199.63 | $52,438,927.92 | N/A |
| **Common Securities**[10] | May 1, 2041 | $23,387,254.01 | $292,052.86 | $23,679,306.87 | $1,621,730.84 | N/A |

---

[7] This amount includes interest accrued as of the Petition Date, and does not include any Post-Petition interest to which such Claim holders may be entitled.

[8] This amount includes the estimated amount of interest accrued at the Federal Judgment Rate of 1.95%, the weekly average 1-year constant maturity Treasury yield as of 9/26/08, through an expected Effective Date of February 29, 2012. Each holder's Post-Petition Interest Claim will continue to accrue until the date that such holder's Allowed PIERS Claim and related Post-Petition Interest Claim are paid in full.

[9] Pursuant to the Opinion issued on September 13th, 2011, all creditors are entitled to post-petition interest at the federal judgment rate. Due to the PIERS contractual subordination, PIERS holders will pay up to more senior creditors at the contract rate. This will limit the recovery of the PIERS holders to an amount less than their prepetition claim. Therefore, the PIERS will not recover any post-petition interest and a chart has not been included.

[10] These securities are owned by WMI.

**EXHIBIT E**

**SENIOR NOTES CLAIMS**

| Notes Issuance | Maturity Date | Allowed Principal | Allowed Accrued Interest[11] | Allowed Total Amount | Post-Petition Interest at the Federal Judgment Rate[12] | Post-Petition Interest Pursuant to Contractual Subordination[13] |
|---|---|---|---|---|---|---|
| 4.0% Notes | January 15, 2009 | $804,984,292.60 | $6,351,912.45 | $811,336,205.05 | $55,566,193.55 | $118,367,621.56 |
| 4.2% Notes | January 15, 2010 | $504,220,132.10 | $4,178,270.72 | $508,398,402.82 | $34,818,813.55 | $78,200,055.34 |
| 5.5% Notes | August 24, 2011 | $361,181,452.96 | $1,766,795.55 | $362,948,248.51 | $24,857,331.03 | $74,533,431.72 |
| 5.0% Notes | March 22, 2012 | $374,791,867.96 | $208,722.22 | $375,000,590.18 | $25,682,762.89 | $70,307,128.80 |
| 5.25% Notes | September 15, 2017 | $726,744,896.63 | $1,171,426.67 | $727,916,323.30 | $49,852,994.43 | $143,676,877.37 |
| Floating Rate Notes | August 24, 2009 | $358,645,000.00 | $911,252.44 | $359,556,252.44 | $24,625,022.51 | $10,187,795.02 |
| Floating Rate Notes | January 15, 2010 | $175,500,000.00 | $1,099,878.10 | $176,599,878.10 | $12,094,841.75 | $6,965,280.76 |
| Floating Rate Notes | March 22, 2012 | $363,350,000.00 | $141,454.17 | $363,491,454.17 | $24,894,533.70 | $12,776,152.32 |
| Floating Rate Notes | September 17, 2012 | $446,815,000.00 | $359,267.16 | $447,174,267.16 | $30,625,740.26 | $17,226,159.27 |

---

[11] This amount includes interest accrued as of the Petition Date, and does not include any Post-Petition interest to which such Claim holders may be entitled.

[12] This amount includes the estimated amount of interest accrued at the Federal Judgment Rate of 1.95%, the weekly average 1-year constant maturity Treasury yield as of 9/26/08, through an expected Effective Date of February 29, 2012.

[13] This amount includes the estimated amount of interest accrued and OID accretion from the Petition Date through an expected Effective Date of February 29, 2012. Each holder's Post-Petition Interest Claim will continue to accrue until the date that such holder's Allowed Senior Notes Claim and related Post-Petition Interest Claim are paid in full.

**EXHIBIT F**

**SENIOR SUBORDINATED NOTES CLAIMS**

| Notes Issuance | Maturity Date | Allowed Principal | Allowed Accrued Interest[14] | Allowed Total Amount | Post-Petition Interest at the Federal Judgment Rate[15] | Post-Petition Interest Pursuant to Contractual Subordination[16] |
|---|---|---|---|---|---|---|
| 8.250% Notes | April 1, 2010 | $451,870,530.25 | $18,133,500.00 | $470,004,030.25 | $32,189,288.18 | $150,685,503.85 |
| 4.625% Notes | April 1, 2014 | $729,187,229.50 | $16,449,467.71 | $745,636,697.21 | $51,066,614.28 | $128,616,663.37 |
| 7.250% Notes | November 1, 2017 | $437,962,198.47 | $12,862,043.75 | $450,824,242.22 | $30,875,717.05 | $126,532,649.40 |

---

[14] This amount includes interest accrued as of the Petition Date, and does not include any Post-Petition interest to which such Claim holders may be entitled.

[15] This amount includes the estimated amount of interest accrued at the Federal Judgment Rate of 1.95%, the weekly average 1-year constant maturity Treasury yield as of 9/26/08, through an expected Effective Date of February 29, 2012.

[16] This amount includes the estimated amount of interest accrued and OID accretion from the Petition Date through an expected Effective Date of February 29, 2012. Each holder's Post-Petition Interest Claim will continue to accrue until the date that such holder's Allowed Senior Subordinated Notes Claim and related Post-Petition Interest Claim are paid in full.

# EXHIBIT G

# BENEFIT PLANS

## Legacy Non-Qualified Deferred Compensation Plans - DEFINED CONTRIBUTION

| Abbreviation | Full Name |
|---|---|
| Bowery Savings - DCP | Bowery Savings - Deferred Compensation Plan |
| H.F. Ahmanson & Co. - CAP | Capital Accumulation Plan of H. F. Ahmanson & Company |
| H.F. Ahmanson & Co. - CDCP | 1989 Contingent Deferred Compensation Plan of H. F. Ahmanson & Company |
| H.F. Ahmanson & Co. - EDCP | Elective Deferred Compensation Plan of H. F. Ahmanson & Company |
| H.F. Ahmanson & Co. - LCCAP | Loan Consultant Capital Accumulation Plan of H. F. Ahmanson & Company |
| H.F. Ahmanson & Co. - LCEDCP | Loan Agents' Elective Deferred Compensation Plan of H. F. Ahmanson & Company |
| H.F. Ahmanson & Co. - ODCAP | Outside Directors' Capital Accumulation Plan of H. F. Ahmanson & Company |
| H.F. Ahmanson & Co. - ODEDCP | Outside Directors' Elective Deferred Compensation Plan of H. F. Ahmanson & Company |

## Legacy Non-Qualified Deferred Compensation Plans - DEFINED BENEFIT

| Abbreviation | Full Name |
|---|---|
| H.F. Ahmanson & Co. - EDCP CAP | PROVISIONS WITHIN THE: Elective Deferred Compensation Plan of H. F. Ahmanson & Company & Capital Accumulation Plan of H. F. Ahmanson & Company |
| H.F. Ahmanson & Co. - ELIP | Executive Life Insurance Plan of H. F. Ahmanson & Company |
| H.F. Ahmanson & Co. - HSB ODRP | Ahmanson / Home Savings Bank Outside Directors Retirement Plan |
| H.F. Ahmanson & Co. - ODRP | Outside Director Retirement Plan of H. F. Ahmanson & Company |
| H.F. Ahmanson & Co. - SERP | Supplemental Executive Retirement Plan of H. F. Ahmanson & Company |
| H.F. Ahmanson & Co. – SSERP | Senior Supplemental Executive Retirement Plan of H. F. Ahmanson & Company |

## WMI Non-Qualified Deferred Compensation Plans

| Abbreviation | Full Name |
|---|---|
| Washington Mutual, Inc. - DCP | Washington Mutual, Inc. - Deferred Compensation Plan |
| Washington Mutual, Inc. - SERP | Washington Mutual, Inc. - Supplemental Executive Retirement Plan |
| Washington Mutual, Inc. - SERAP | Washington Mutual, Inc. - Supplemental Executive Retirement Accumulation Plan |
| Washington Mutual, Inc. - ETRIP | Washington Mutual, Inc. - Executive Target Retirement Income Plan |

G-1

## Individual Contracts

| Abbreviation | Full Name |
|---|---|
| H.F. Ahmanson & Co. - AHM Supplemental (collection of individual contracts) | HFA AHM Supplemental - Hazel Legg |
| | HFA AHM Supplemental - Anna Varosy |
| H.F. Ahmanson & Co. - Individual Contracts | HFA Individual Contract - John Holoman |
| | HFA Individual Contract - Charles Roussin |
| | HFA Individual Contract - Bruce Manley |
| | HFA Individual Contract - William Wiley |

## Split Dollar Plans

| Abbreviation | Full Name |
|---|---|
| HFA ELIP | Executive Life Insurance Plan of H.F. Ahmanson & Company |
| HFA SELIP | Senior Executive Life Insurance Plan of H.F. Ahmanson & Company |

G-2

US_ACTIVE:\43898579\04\79831.0003

# EXHIBIT H

## WATERFALL RECOVERY MATRIX

## EXHIBIT H

## WATERFALL RECOVERY MATRIX

Washington Mutual, Inc.
Waterfall Recovery Matrix

| Recovery[2] | | Senior Fixed Rate Notes | Senior Floating Rate Notes | Senior Subordinated Notes | CCB Guarantees[1] | PIERS | General Unsecured Creditors | 510(b) Sub. Claims | Preferred Stock |
|---|---|---|---|---|---|---|---|---|---|
| | Tranche 1 | Prepetition Claim | Prepetition Claim | – | – | – | Pro Rata Share Based on Prepetition Claims[3] | | |
| | Tranche 2[4] | Intercreditor Interest Claim | Intercreditor Interest Claim | Prepetition Claim & Intercreditor Interest Claim | | | Pro Rata Share Based on Prepetition Claims[3] | – | – |
| | | | | | | | Late Filed Claims[5] | | |
| | | | | | | | Post-Petition Interest Claim[6] | | |
| | Tranche 3 | – | – | – | Prepetition Claim & Intercreditor Interest Claim | – | Post-Petition Interest Claim[6] | – | – |
| | Tranche 4 | – | Remaining Postpetition Interest Claim[7] | – | – | PIERS Claim | | – | – |
| | Tranche 5 | – | – | – | – | – | – | Claims | – |
| | Tranche 6 | – | – | – | – | – | – | – | Claims |

Notes:

[1]  CCB Guarantees include HFC Capital Trust I, CCB Capital Trust IV, CCB Trust V, CCB Trust VI, CCB Capital Trust VII, CCB Capital Trust VIII and CCB Capital Trust IX.

[2]  Eligible claims in Tranches will be paid in order with Tranche 1 claims receiving disbursements first and Tranche 5 claims receiving disbursements last. Tranche 1 eligible claims must be satisfied in full prior to Tranche 2 eligible claims receiving disbursements and so forth. For information regarding the distribution of Reorganized Common Stock, see Sections 6.2, 7.2, 16.2, 18.2, 19.2, 20.2 and 32.1(a) of the Plan.

[3]  Pro Rata share of General Unsecured Claims are calculated by (a) determining the fraction in which the numerator equals the amount of General Unsecured Claims and the denominator equals the total amount of prepetition claims, and (b) by multiplying that by total cash distributed within the Tranche. The cash distributed within the Tranche is the lesser of (i) the amount necessary to satisfy all claims within the Tranche or (ii) the amount of cash available.

[4]  Within Tranche 2, the Senior Notes Intercreditor Interest Claim and the Subordinated Notes Prepetition Claim and Intercreditor Interest Claim will share pro rata based on the size of those claims. For the calculation of the General Unsecured Creditors' pro rata share in all Tranches, see footnote 3.

[5]  Late filed claims will be paid only after all other prepetition claims (other than Subordinated Claims) are paid in full without giving effect to applicable turnover provisions. Late filed claims will not share pro rata with any other claims. Therefore, to the extent late filed claims are paid, this will create a break in the recovery of other creditors prior to their recovery on account of post-petition interest from the Debtors. The placement of late filed claims in the chart above is illustrative only, as the size of the pre-petition Allowed General Unsecured Claims and the amount of post-petition interest turned over on account of contractual subordination provisions will influence their position in the waterfall. The late filed claims will, in any event, be paid immediately after satisfaction of pre-petition Allowed General Unsecured Claims, but prior to the payment of post-petition interest and Subordinated Claims.

[6]  If it is provided for in an applicable contract or by law, the General Unsecured Creditors' Post-Petition Interest Claim will share pro rata with distributions to holders of PIERS claims on account of post-petition interest with respect to all post-petition interest claims, including Post-Petition Interest Claims to which the holders of PIERS Claims have been subrogated (on account of turnover in accordance with contractual subordination provisions). The chart above is illustrative only, as the point at which the Allowed General Unsecured Claims begin receiving post-petition interest is dependent on the size of the Allowed General Unsecured prepetition claims and the amount of post-petition interest paid pursuant to contractual subordination.

[7]  The Senior Floating Rate Notes Remaining Post-Petition Interest Claim will be paid only when interest in excess of the contract rate would have been paid if such payment were actually being made by the Debtors as opposed to by reason of contractual subordination. After that trigger has been met (currently projected to occur during the payouts in Tranche 4), that claim will be paid pari passu with the remaining claims in Tranche 4.

# EXHIBIT I

## GLOBAL SETTLEMENT AGREEMENT

## SECOND AMENDED AND RESTATED SETTLEMENT AGREEMENT

SECOND AMENDED AND RESTATED SETTLEMENT AGREEMENT (the "*Agreement*"), dated as of February 7, 2011, by and among (a) Washington Mutual, Inc. ("*WMI*") and WMI Investment Corp. ("*WMIIC*" and, collectively with WMI, the "*Debtors*"), (b) JPMorgan Chase Bank, N.A. ("*JPMC*" and, collectively with those of JPMC's affiliates that have filed proofs of claim against the Debtors and the Debtors' chapter 11 estates or that are Acquisition JPMC Entities, as defined below, the "*JPMC Entities*"), (c) Federal Deposit Insurance Corporation, in its capacity as receiver for Washington Mutual Bank ("*FDIC Receiver*"), (d) Federal Deposit Insurance Corporation, in its corporate capacity ("*FDIC Corporate*"), and (e) the official committee of unsecured creditors appointed in the Debtors' chapter 11 cases (the "*Creditors' Committee*"). The signatories hereto are referred to hereinafter collectively as the "*Parties*" or individually as a "*Party*". Capitalized terms used but not otherwise defined herein shall have the meanings set forth in Article I below.

## RECITALS

A.     On September 25, 2008, the Office of Thrift Supervision (the "*OTS*"), by order number 2008-36, closed Washington Mutual Bank ("*WMB*"), appointed the FDIC Receiver as receiver for WMB and advised that the FDIC Receiver was immediately taking possession of WMB's assets.

B.     On or about September 25, 2008, the FDIC Receiver, FDIC Corporate and JPMC entered into that certain Purchase and Assumption Agreement, Whole Bank, dated September 25, 2008, as amended, modified or supplemented prior to the date hereof (the "*Purchase and Assumption Agreement*"). JPMC has asserted various claims for indemnity against each of the FDIC Receiver and FDIC Corporate arising from the Purchase and Assumption Agreement, including, but not limited to, (1) claims for indemnity for and against any and all potential losses, claims or liabilities arising from or related to the mortgage origination and sale/securitization activities of WMB and its affiliates, including, without limitation, liabilities associated with the Complaint filed in the litigation styled Deutsche Bank National Trust Co. v. FDIC, No. 09-cv-01656 (RMC), currently pending in the D.C. District Court, as defined below, and (2) other claims for indemnity under Section 12.1(a)(9) of the Purchase and Assumption Agreement.

C.     On September 26, 2008 (the "*Petition Date*"), each of the Debtors filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code, as amended (the "*Bankruptcy Code*"), with the United States Bankruptcy Court for the District of Delaware (the "*Bankruptcy Court*"). By order, dated October 3, 2008, the Debtors' chapter 11 cases are being jointly administered and are styled as In re Washington Mutual, Inc., et al., No. 08-12229 (MFW) (the "*Chapter 11 Cases*").

D.     On December 30, 2008, the Debtors filed with the FDIC Receiver a proof of claim against WMB's receivership (the "*Receivership*" and, collectively with

the FDIC Receiver and FDIC Corporate, sometimes hereinafter referred to as the "**FDIC Parties**"), asserting claims on behalf of the Debtors' chapter 11 estates (the "*Debtors' Claims*"). By letter, dated January 23, 2009, and entitled "*Notice of Disallowance*", the FDIC Receiver disallowed the Debtors' Claims.

   E. On March 20, 2009, the Debtors commenced litigation (the "*WMI Action*") against the FDIC by filing a Complaint, styled <u>Washington Mutual, Inc. and WMI Investment Corp.</u> v. <u>FDIC</u>, Case No. 09-00533, in the United States District Court for the District of Columbia (the "*D.C. District Court*"), challenging the FDIC Receiver's disallowance of the Debtors' Claims, and asserting, among other claims, a claim for the Disputed Accounts, as defined below, as deposits and several causes of action to avoid preferential or fraudulent transfers pursuant to the Bankruptcy Code and other applicable federal and state laws. On June 11, 2009, FDIC Corporate filed a motion to dismiss the claims asserted against FDIC Corporate and the FDIC Receiver filed an answer and counterclaims asserting claims against the Debtors and a motion to dismiss certain aspects of the Debtors' complaint in the WMI Action. On July 13, 2009, the FDIC Receiver amended its counterclaims and added JPMC as an additional counterclaim defendant. JPMC and certain holders of funded indebtedness of WMB (collectively, the "*Bank Creditors*") have intervened, and the Creditors' Committee has moved to intervene, in the WMI Action. By order, dated January 7, 2010, the D.C. District Court ordered, among other things, that all proceedings in the WMI Action shall be stayed pending a determination by the Bankruptcy Court in the JPMC Action and the Turnover Action, each as defined below, as well as any pending or subsequent appeals.

   F. On March 24, 2009, JPMC commenced litigation against the Debtors by filing a Complaint, styled <u>JPMorgan Chase Bank, N.A.</u> v. <u>Washington Mutual, Inc., et al.</u>, Adversary Pro. No. 09-5-50551(MFW), in the Bankruptcy Court, asserting claims against the Debtors with respect to assets that JPMC claims to have acquired pursuant to the Purchase and Assumption Agreement (the "*JPMC Action*") and named the FDIC Receiver as an additional defendant. On May 29, 2009, the Debtors filed an answer and counterclaims. JPMC filed a motion to dismiss such counterclaims, which motion was denied by the Bankruptcy Court on August 24, 2009. The Creditors' Committee and the Bank Creditors have intervened in the JPMC Action.

   G. On April 27, 2009, the Debtors commenced litigation against JPMC by filing a Complaint, styled <u>Washington Mutual, Inc. et al.</u> v. <u>JPMorgan Chase Bank, N.A.</u>, Adversary Pro. No. 09-50934(MFW), in the Bankruptcy Court, seeking to recover the Disputed Accounts (the "*Turnover Action*"). JPMC filed a motion to dismiss the Turnover Action, which motion to dismiss was denied by the Bankruptcy Court on June 24, 2009. On July 6, 2009, JPMC filed an answer, counterclaims and a crossclaim that named the FDIC Receiver as an additional defendant in the Turnover Action. On July 27, 2009, the FDIC Receiver filed an answer to JPMC's crossclaim. On August 11, 2009, JPMC filed an amended answer and counterclaims, which also named the FDIC Receiver as a counterclaim defendant. On August 20, 2009, the FDIC Receiver filed an answer to JPMC's amended counterclaims. By motion, dated May 19, 2009 (the "*SJ Motion*"), the Debtors sought entry of an order granting summary judgment in their favor

and directing turnover of the Disputed Accounts to WMI. A hearing to consider the SJ Motion was held on October 22, 2009 and the matter is *sub judice*. The Creditors' Committee and the Bank Creditors have intervened in the Turnover Action.

      H.    On June 24, 2009, the Bankruptcy Court denied motions by the FDIC Receiver and JPMC to stay or dismiss the Turnover Action and the JPMC Action in favor of proceedings before the D.C. District Court in the WMI Action (the "*Bankruptcy Stay Motions*"). The Bankruptcy Stay Motions are the subject of pending appeals or, in the alternative, motions for leave to appeal to the United States District Court for the District of Delaware (the "*Delaware District Court*") and to a motion by the FDIC Receiver for certification for immediate appeal to the United States Court of Appeals for the Third Circuit.

      I.    By order, dated January 30, 2009 (the "*Bar Date Order*"), the Bankruptcy Court established March 31, 2009, at 5:00 p.m. (Eastern Time) (the "*Bar Date*"), as the date and time by which all proofs of claim against the Debtors and their chapter 11 estates must be filed with the Bankruptcy Court in the manner and form set forth in the Bar Date Order.

      J.    On or prior to the Bar Date, JPMC and certain of the other JPMC Entities filed proofs of claim against the Debtors and their chapter 11 estates (collectively, the "*JPMC Claims*"), which JPMC Claims are listed on Exhibit "A" hereto. As of the date hereof, the Debtors have not interposed a substantive objection to the JPMC Claims.

      K.    On or prior to the Bar Date, the FDIC Receiver filed the following proof of claim against the Debtors and their chapter 11 estates (collectively, the "*FDIC Claim*"):

| Claimant | Claim No. | Debtor | Claim Amount |
|---|---|---|---|
| Federal Deposit Insurance Corporation, as Receiver for Washington Mutual Bank | 2140 | WMI | Unliquidated |

As of the date hereof, the Debtors have not interposed a substantive objection to the FDIC Claim.

      L.    Proofs of claim have been filed, timely or otherwise, against the Debtors and their chapter 11 estates by holders, including the Bank Creditors, of funded indebtedness against WMB (collectively, the "*Bank Bondholder Claims*"), which Bank Bondholder Claims are listed on Exhibit "B" hereto. The Debtors, as joined by the Creditors' Committee, have interposed an objection to the Bank Bondholder Claims.

      M.    From and after the Petition Date, the Debtors and JPMC have cooperated to, among other things, (1) determine the respective ownership of assets and responsibility for any corresponding liabilities, (2) facilitate the Debtors' distillation of

financial information and (3) prepare and file, with the assistance of the FDIC Receiver, consolidated tax returns for WMI, WMB and certain of their respective subsidiaries and Affiliates.

N.    By order, dated June 24, 2009, the Bankruptcy Court authorized and permitted the Debtors to conduct discovery pursuant to Rule 2004 of the Federal Rules of Bankruptcy Procedure (the "***Bankruptcy Rules***") in order to facilitate the Debtors' inquiry into the existence of potential additional claims and causes of action of the Debtors and the Debtors' chapter 11 estates against JPMC (the "***Rule 2004 Inquiry***"). By order, dated February 16, 2010, the Bankruptcy Court denied, without prejudice, the Debtors' request to obtain discovery pursuant to Rule 2004 from certain entities and individuals.

O.    The WMI Entities and the JPMC Entities resolved all issues among them relating to the treatment of WaMu Savings Plan and, by order, dated July 27, 2009, the Bankruptcy Court approved such agreement and directed the amendment of the JPMC Action to remove claims and causes of action associated therewith.

P.    By order, dated December 2, 2009, the Bankruptcy Court granted JPMC's Motion to Compel the Washington Mutual, Inc. Noteholders Group to Comply with Rule 2019 of the Federal Rules of Bankruptcy Procedure.  On December 14, 2009, the WMI Noteholders Group filed a notice of appeal therefrom (the "***Rule 2019 Appeal***").

Q.    On December 15, 2009, counsel for WMI sent two letters, entitled (1) "Freedom of Information Act Request" and (2) "Expedited Request for FDIC Exempt Records and Information" (collectively, the "***Record Requests***").  The FOIA/PA Group of FDIC Corporate closed the Freedom of Information Act Request, FDIC Log No. 09-2053, on February 17, 2010.

R.    Pursuant to that certain Settlement Agreement, dated as of May 21, 2010 (the "***Initial Agreement***"), by and among the Parties and certain holders of claims against and equity interests in the Debtors (collectively, the "***Settlement Note Holders***"), the parties thereto agreed to compromise and settle claims and causes of action set forth in, among other actions and proceedings, the WMI Action, the JPMC Action, the Turnover Action, the Rule 2004 Inquiry, the Debtors' Claims, the JPMC Claims, the Bankruptcy Stay Motions and the appeals therefrom, the FDIC Claims and the asserted transfer of the Trust Preferred Securities.

S.    By order, dated July 28, 2010, the Bankruptcy Court approved the appointment of Joshua R. Hochberg as examiner (the "***Examiner***") to investigate among other things, the claims and action being compromised and settled and the assets being transferred pursuant to the terms and provisions of the Initial Agreement.

T.    Subsequent to the execution of the Initial Agreement, the parties thereto agreed to modify the Initial Agreement to address changed circumstances,

including, without limitation, (1) the appointment of the Examiner and the passage of time associated with delivery of the Examiner's final report and (2) a subsequent agreement in connection with Bank Bondholder Claims. These modifications were set forth in that certain (y) Amended and Restated Settlement Agreement, dated as of October 6, 2010, as amended (the "*Amended Agreement*"), which, among other things, extended the termination date therein to December 31, 2010, subject to the rights of the Debtors and JPMC to further extend such date to January 31, 2011 and (z) Sixth Amended Joint Plan of Affiliated Debtors Pursuant to Chapter 11 of the United States Bankruptcy Code, dated October 6, 2010, as modified (the "*Sixth Plan*").

U.      On November 1, 2010, the Examiner issued his final report and determined that the compromise and settlement embodied in the Initial Agreement was fair, reasonable and in the best interests of the Debtors, their creditors and the Debtors' chapter 11 estates.

V.      Commencing on December 2, 2010, the Bankruptcy Court conducted a hearing to consider confirmation of the Sixth Plan and the reasonableness of the compromise and settlement set forth in the Amended Agreement. Thereafter, (1) by order, dated December 20, 2011, the Bankruptcy Court (a) stated that it would be unable to render a decision by the December 31, 2010 termination date and (b) requested that the parties to the Amended Agreement inform the Bankruptcy Court as to whether the termination date of the Amended Agreement would be extended to January 31, 2011 and (2) in response thereto, the Debtors and JPMC, with the consent of the Creditors' Committee, extended the termination date to January 31, 2011 and the Debtors filed a notice thereof with the Bankruptcy Court.

W.      By opinion and order, each dated January 7, 2011, the Bankruptcy Court (1) denied confirmation of the Sixth Plan pending certain modifications being incorporated therein and (2) determined that (a) consummation of the transactions contemplated by the Amended Agreement was in the best interests of the Debtors, their creditors and the Debtors' chapter 11 estates, and (b) the compromise and settlement embodied in the Amended Agreement was fair and reasonable.

X.      Due to, among other things, the passage of time, (1) the Settlement Note Holders have determined not to further extend the termination date of the Amended Agreement and (2) as result thereof, the Debtors exercised their rights pursuant to Section 7.3 of the Amended Agreement and terminated the Amended Agreement.

Y.      The Parties remain committed to the compromise and settlement set forth in the Amended Agreement, as modified herein, and have concluded that because of, among other things, the complexity, inherent delay and substantial expense of litigating the issues associated with the WMI Action, the JPMC Action, the Turnover Action, the Rule 2004 Inquiry, the Debtors' Claims, the JPMC Claims, the Bankruptcy Stay Motions and the appeals therefrom, the FDIC Claim and the asserted transfer of the Trust Preferred Securities and the consequent issuance of the REIT Series, each as defined below, the length of time necessary to resolve each of the issues presented

therein, the complexity and uncertainty involved and the concomitant disruption to the Debtors' efforts to generate distributions for the benefit of the Debtors' creditors and of the FDIC Receiver's efforts to resolve matters with respect to the Receivership, it is in their respective best interests to resolve their disputes and related matters on the terms set forth in this Agreement and as embodied in the Plan, as defined below. The Debtors further believe that the compromise and settlement provided herein is fair and reasonable, and in the best interests of the Debtors, the Debtors' estates and their creditors.

      Z.      Contemporaneous with the execution and delivery of this Agreement, the Debtors have filed with the Bankruptcy Court that certain Modified Sixth Amended Joint Plan of Affiliated Debtors Pursuant to Chapter 11 of the United States Bankruptcy Code, dated February 7, 2011 (as the same may be amended or modified from time to time in accordance with the terms hereof and thereof, the "*Plan*") and a supplemental disclosure statement in connection therewith (as amended, modified or supplemented from time to time, the "*Disclosure Statement*").

      NOW, THEREFORE, the Parties, in consideration of the promises, covenants and agreements herein described and for other good and valuable consideration acknowledged by each of them to be satisfactory and adequate, and intending to be legally bound, do hereby mutually agree as follows:

## ARTICLE I
## DEFINITIONS

      Section 1.1.   <u>Recitals</u>. The recitals set forth above are incorporated by reference and are explicitly made a part of this Agreement.

      Section 1.2.   <u>Definitions</u>. The following definitions shall apply to and constitute part of this Agreement and all schedules, exhibits and annexes hereto:

      "*Acquisition JPMC Entities*" shall mean JPMC in its capacity as the "*Acquiring Bank*" pursuant to the Purchase and Assumption Agreement and each former subsidiary of WMB acquired pursuant to the Purchase and Assumption Agreement (including each entity into which such former subsidiary may have been merged, consolidated or liquidated), together with JPMC in its capacity as the "*Purchaser*" pursuant to the Purchase and Assumption Agreement.

      "*Actions*" shall mean, collectively, the WMI Action, the JPMC Action, the Turnover Action, the Record Requests, the Rule 2004 Inquiry and the Bankruptcy Stay Motions, together with any and all appeals therefrom, the Rule 2019 Appeal and any proceeding arising from the motions, dated June 23, 2009, to withdraw the reference for the WMI Action and the JPMC Action, respectively.

      "*Admin Account*" shall mean that certain account, Account No. xxxxxx1206, maintained by WMI at WMB and having a balance as of the Petition Date

in the approximate amount of Fifty Two Million Six Hundred Thousand Dollars ($52,600,000.00).

"*Affiliate*" shall mean, with respect to any specified entity, any other Person that directly, or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, such specified entity.

"*Affiliate Managed Fund*" shall mean, with respect to any specified entity, a fund, money market account, investment account or other account managed, directly or indirectly by such entity, by an Affiliate of such entity, by such entity's investment manager, or by an Affiliate of such investment manager.

"*Affiliated Banks*" shall mean WMB and Washington Mutual Bank fsb ("*FSB*").

"*Allowed Claim*" shall have the meaning ascribed to it in the Plan.

"*American Savings Litigation*" shall mean that certain litigation styled American Savings Bank, F.A. v. United States, No. 92-872C, currently pending in the United States Court of Federal Claims.

"*Anchor Litigation*" shall mean that certain litigation styled Anchor Savings Bank, FSB v. United States, No. 95-39C, pending in the United States Court of Federal Claims, and as an appeal in the United States Court of Appeals for Federal Circuit as Anchor Savings Bank, FSB v. United States, No. 2008-5175, -5182.

"*Assumed Liabilities*" shall mean, collectively, and except as otherwise set forth in this Agreement, the obligations, undertakings and liabilities expressly assumed by JPMC and the Acquisition JPMC Entities herein, as follows: (a) to the extent payment or performance of such liability or obligation arising from or relating to the period from and after the Effective Date, all obligations, undertakings and liabilities relating to such payment or performance, and (b) to the extent payment or performance of such liability or obligation was due during the period prior to the Effective Date, all obligations, undertakings and liabilities relating to such payment or performance to the extent of, and in the amounts of, the contractual obligations, undertakings and liabilities arising from or relating to such obligations, undertakings and liabilities; provided, however, that, for purposes of clause (b) above, or to the extent that the delay in payment or performance thereof was due to the actions or inactions, as the case may be, of the WMI Entities, "*Assumed Liabilities*" shall not include (i) any damages or compensation for any default, failure to perform or delay in the performance or payment of any obligations, undertakings, or liabilities in connection with such assets or agreements, whether or not provided for in any agreement, document, applicable provision of law or otherwise, (ii) any damages, losses, liabilities, claims or causes of action that are based in tort or on any statute, regulation, rule or principle of applicable or common law or promulgated by governmental or regulatory authority or agency, or that otherwise are extra contractual, or (iii) any special, exemplary, consequential or punitive damages.

"**BKK Litigation**" shall mean that litigation styled <u>California Dep't. of Toxic Substances Control, et al.</u> v. <u>American Honda Motor Co. Inc., et al.</u>, No. CV05-7746 CAS (JWJ), currently pending in the United States District Court for the Central District of California.

"**Bond Indemnity**" shall mean that certain General Agreement of Indemnity, dated as of June 14, 1999, executed and delivered by WMI in connection with the issuance of the Bonds.

"**Bonded Obligations**" shall mean, collectively, those liabilities with respect to which the Bonding Companies issued the Bonds, whether or not such obligations are contingent, unliquidated or disputed.

"**Bonding Companies**" shall mean, collectively, Safeco Insurance Company and each other insurance or bonding company that issued Bonds pursuant to the Bond Indemnity.

"**Bonds**" shall mean the bonds issued by the Bonding Companies on behalf of one or more of the Affiliated Banks or their Affiliates, each as identified on Exhibit "D" hereto, together with the numbers of the respective proofs of claim which have been filed with the Bankruptcy Court in connection therewith.

"**Business Day**" shall mean a day other than a Saturday, a Sunday or any other day on which commercial banks in New York, New York are required or authorized to close by law or executive order.

"**Buus Litigation**" shall mean that certain litigation styled <u>Buus</u> v. <u>Washington Mutual Pension Plan, et al.</u>, No. 07-CV-903 (MJP), currently pending in the United States District Court for the Western District of Washington.

"**Claims**" shall mean any and all claims, causes of action, liabilities, obligations, undertakings, damages, losses or other rights or remedies, whether at law or in equity, including, without limitation, all "*claims*" as defined in section 101(5) of the Bankruptcy Code.

"**Confirmation Order**" shall mean the order of the Bankruptcy Court confirming the Plan in accordance with section 1129 of the Bankruptcy Code, approving the compromise and settlement set forth in this Agreement and directing the consummation of the transactions contemplated herein, which order shall be in form and substance reasonably satisfactory to the Debtors, JPMC, the FDIC Receiver, FDIC Corporate and the Creditors' Committee.

"**Disputed Accounts**" shall mean the amounts and intercompany balances identified with the account numbers set forth on Exhibit "E" hereto.

"*Effective Date*" shall mean the first (1st) Business Day after the date on which all conditions to effectiveness set forth in Section 7.2 hereof shall have been satisfied or, to the extent not satisfied, waived in writing, in whole or in part, by each of the Parties.

"*ERISA Litigation*" shall mean that certain litigation styled In re Washington Mutual, Inc. ERISA Litigation, No. C07-1874 (MJP), currently pending in the United States District Court for the Western District of Washington.

"*FDIC Escrow Account*" shall mean the account established pursuant to the terms and conditions set forth in the Escrow Agreement attached hereto as Exhibit "F".

"*FDIC Order of Investigation*" shall mean any "*Order of Investigation*" (or similarly titled investigative or regulatory action or proceeding) issued or commenced by, or in the name of, the FDIC Receiver or FDIC Corporate (as the case may be) pursuant to applicable provisions of the Federal Deposit Insurance Act, as amended, (including 12 U.S.C. §1818(n) and 12 U.S.C. §1821(d)(2)(I)) relating to any actual or potential investigation based upon, arising from, or in connection with the acts of former officers, directors, advisors and service providers of WMB or FSB (or their respective predecessors, successors or assigns). Without in any way limiting the foregoing, for purposes of this definition, subject matters covered by any such "*Order of Investigation*" shall include, but not be limited to, (a) compliance (or non-compliance) with applicable banking laws, rules and regulations, (b) fraudulent practices related to WMB's retail banking, mortgage lending, small business lending and credit card operations and activities, (c) employee compensation and benefit arrangements, (d) the capitalization or under-capitalization of WMB, as the case may be, (e) the improper payment of dividends or other payments by WMB or FSB, as the case may be, to WMI and (f) general allegations of fraud, breach of duty or gross negligence.

"*FDIC Stay Relief Motion*" shall mean the motion, dated November 4, 2009, filed by the FDIC Receiver in the Bankruptcy Court seeking relief from the automatic stay pursuant to section 362 of the Bankruptcy Code in order to exercise rights pursuant to Section 9.5 of the Purchase and Assumption Agreement.

"*Final Order*" shall mean an order or judgment of the Bankruptcy Court or other court of competent jurisdiction with respect to the applicable subject matter which has not been reversed, stayed, modified or amended and as to which (a) any right to appeal or seek certiorari, review, reargument, stay or rehearing has expired and no appeal or petition for certiorari, review, reargument, stay or rehearing is pending, or (b) an appeal has been taken or petition for certiorari, review, reargument, stay or rehearing has been filed and (i) such appeal or petition for certiorari, review, reargument, stay or rehearing has been resolved by the highest court to which the order or judgment was appealed or from which certiorari, review, reargument, stay or rehearing was sought or (ii) the time to appeal further or seek certiorari, review, reargument, stay or rehearing has expired and no such further appeal or petition for certiorari, review, reargument, stay or

rehearing is pending; <u>provided</u>, <u>however</u>, that the possibility that a motion pursuant to Rule 60 of the Federal Rules of Civil Procedure or Bankruptcy Rule 9024 may be filed relating to such order shall not cause such order to not be a Final Order.

"*Group*" shall mean (a) for U.S. federal income Tax purposes, any affiliated group of corporations within the meaning of section 1504 of the IRC, and (b) for state, local or foreign Tax purposes, any group of corporations that filed (or was required to file) as a combined, unitary or consolidated group under state, local or foreign Tax laws, with respect to which, for purposes of both clause (a) and clause (b) hereof, (i) any of the WMI Entities (or any predecessors thereof) is or was a member and (ii) WMB (or any predecessor thereof) or any subsidiary of WMB (or any predecessor thereof) as of September 24, 2008 is or was also a member.

"*Group Taxes*" shall mean any Taxes of the Group, as well as any Taxes imposed by the State of California in 2008 on any member of the U.S. consolidated group of which WMI was the common parent, whether imposed on a separate return basis, or on a combined, unitary or consolidated group basis.

"*Homeownership Carryback*" shall mean Section 13 of the Worker Homeownership, and Business Assistance Act of 2009.

"*Homeownership Carryback Refund Amount*" shall mean the amount of U.S. federal income Tax refunds of Pre-2009 Group Taxes that are solely attributable to the Homeownership Carryback less any Homeownership Refund Taxes or any decreases in refunds that would have been receivable without the Homeownership Carryback.

"*Homeownership Carryback Threshold*" shall mean the amount of Net Tax Refunds that would be a receivable applying the Tax law in effect on the date of calculation, but with the provisions of the IRC amended by the Homeownership Carryback replaced by the provisions of the IRC that would be in effect if the Homeownership Carryback had not been enacted, and without taking into account any Refund Related Group Taxes in excess of the Refund Related Group Taxes that would have been incurred if the IRC had not been amended by the Homeownership Carryback.

"*Homeownership Refund Taxes*" shall mean Taxes imposed on the Group (or any member of the Group) that would not have been imposed on the Group (or any member of the Group) but for the receipt, by the Group, a member of the Group or any Party to this Agreement, of Tax refunds that are attributable to the Homeownership Carryback.

"*IAA/FDIC*" shall mean that certain letter agreement, dated November 19, 2008, between the Debtors, the Creditors' Committee and the FDIC Receiver, as may be amended.

"*IAA/JPMC*" shall mean that certain Information Access Agreement, dated November 21, 2008, between the Debtors and JPMC, as amended.

"*Interchange Litigation*" shall mean, collectively, that certain litigation styled (a) In re Payment Card Interchange Fee and Merchant-Discount Antitrust Litigation, Master File No. 1:05-md-1720-JG-JO, currently pending in the United States District Court for the Eastern District of New York ("MDL 1720"), including any litigation that is transferred for coordinated or consolidated proceedings at any time to MDL 1720 by the Judicial Panel on Multidistrict Litigation or otherwise included at any time in MDL 1720 by order of any court of competent jurisdiction, and (b) Attridge v. Visa U.S.A. Inc. et al., Case No. CGC-04-436920, currently pending in California Superior Court.

"*IRC*" shall mean the Internal Revenue Code of 1986, as amended from time to time, and any regulations promulgated thereunder.

"*IRS*" shall mean the Internal Revenue Service.

"*Issuing Trusts*" shall mean Washington Mutual Preferred (Cayman) I, Washington Mutual Preferred Funding Trust I, Washington Mutual Preferred Funding Trust II, Washington Mutual Preferred Funding Trust III and Washington Mutual Preferred Funding Trust IV.

"*JPMC Allowed Unsecured Claim*" shall mean, collectively and in the aggregate, the claims of JPMC set forth in Section 2.22 hereof, which claims shall be classified with and treated in the same manner as other allowed general unsecured claims pursuant to the Plan; provided, however, that, in the sole and absolute discretion of the Debtors, for purposes of this Agreement and the compromise and settlement embodied herein, each Allowed Claim comprising the JPMC Allowed Unsecured Claim may be counted as a separate claim for purposes of voting to accept or reject the Plan.

"*JPMC Escrow Account*" shall mean the account at JPMorgan Chase Bank, National Association, established pursuant to the terms and conditions set forth in the Escrow Agreement attached hereto as Exhibit "F".

"*Lakeview Plan*" shall mean that certain Retirement Income Plan for the Salaried Employees of Lakeview Savings Bank, which plan is intended to satisfy the tax requirements of Section 401 of the IRC and is sponsored by WMI.

"*Net Tax Refunds*" shall mean the sum of (a) the amount of refunds of Pre-2009 Group Taxes deposited into the Refund Escrow Account plus (b) the amount of refunds of Pre-2009 Group Taxes actually received on or after the Petition Date by any Party (other than any refunds deposited in the Disputed Accounts and the WMI Accounts governed by Section 2.1 hereof), any current or future subsidiary of any Party, any entity that is or was a subsidiary of any Party at any time on or after the Petition Date, any entity that is or was an Affiliate at any time on or after the Petition Date of any Party, any successor of any Party (including, for the avoidance of doubt, any liquidating trust established pursuant to the Plan) or any member of any Group that, for whatever reason, has not been deposited in the Refund Escrow Account (treating, for all purposes under